Mary McNamara, SBN 147131
mary@smllp.law
Hannah Pollack, SBN 336599
hannah@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant SHANE CRATTY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>SHANE CRATTY,<br><br>　　　　　　　　　Defendant. | Case No. CR 19-0681 CRB<br><br>**DEFENDANT SHANE CRATTY'S MOTION FOR COMPASSIONATE RELEASE TO INPATIENT TREATMENT FACILITY**<br><br>Date:　　TBD<br>Time:　　TBD<br>Dept.:　　Courtroom 6, 17th Floor<br>Judge:　　Hon. Charles R. Breyer |

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. RELEVANT BACKGROUND ................................................................................ 2

   A. History of this Motion ....................................................................................... 2

   B. Mr. Cratty's Childhood and Personal Background ......................................... 3

   C. The Offense Conduct, Plea Negotiations and Sentencing ............................... 4

   D. Mr. Cratty's Custodial Adjustment at Santa Rita Jail ................................... 5

   E. Mr. Cratty's Custodial Adjustment in BOP Custody ..................................... 6

     1. FCI Sheridan—medication instability, dysregulated behavior. ................... 7

     2. FCI Butner—profound deterioration in mental and physical health ........... 8

     3. USP Canaan—an especially dangerous high-security penitentiary .............. 14

III. LEGAL STANDARD ............................................................................................. 16

IV. ARGUMENT ......................................................................................................... 17

   A. Mr. Cratty Has Exhausted His Administrative Remedies .............................. 17

   B. Extraordinary and Compelling Reasons Warrant a Reduction in Mr. Cratty's Sentence ................................................................................................................ 18

     1. The BOP's inability to provide adequate mental health care to Mr. Cratty is an Extraordinary and Compelling Reason for Release ....................................... 18

     2. Alternatively, the Court Should Find Extraordinary and Compelling Reasons Under § 1B1.13(b)(5) Because the Lack of Adequate Mental-Health Care Is Similar in Gravity to Unmet Medical Care .................................................... 21

   C. Mr. Cratty is Not a Danger to the Community .............................................. 21

   D. The § 3553(a) Factors Weigh in Favor of Reducing Mr. Cratty's Sentence ......... 22

V. CONCLUSION ....................................................................................................... 24

<u>**TABLE OF AUTHORITIES**</u>

**FEDERAL CASES**

*United States v. Beck*,
  425 F. Supp. 3d 573 (M.D.N.C. 2019) .................................................................................... 18

*United States v. Bryant*,
  144 F.4th 1119 (9th Cir. 2025).............................................................................................. 21

*United States v. Coppin*,
  No. 2:16-CR-00223-KJM, 2020 WL 7646416 (E.D. Cal. Dec. 23, 2020) ............................... 18

*United States v. Hougen*,
  No. 5:20-CR-00432-1 EJD, 2025 WL 798604 (N.D. Cal. Mar. 10, 2025) .............................. 18

*United States v. Sanders*,
  No. 2:13-CR-00312-KJM, 2021 WL 78869 (E.D. Cal. Jan. 6, 2021) ...................................... 18

**FEDERAL STATUTES**

18 U.S.C. § 3553(a) .......................................................................................................... 2, 22, 23

18 U.S.C. § 3852............................................................................................................... 16, 17

21 U.S.C. § 841(a) ................................................................................................................... 5

21 U.S.C. § 846........................................................................................................................ 5

28 CFR § 115.62 .............................................................................................................. 11, 13

28 CFR § 541.1 ...................................................................................................................... 11

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

## I. INTRODUCTION

Mr. Cratty seeks a twelve-month reduction in his sentence via compassionate release because the BOP has not provided the medical care necessary to keep him safe and stable. Continued incarceration now poses a serious risk of further deterioration and, possibly, death. Since entering BOP custody in March 2022, Mr. Cratty's severe mental illness and substance use disorder have worsened to the point that his life is now in danger. He suffered a psychotic breakdown in June 2025 when he attempted to walk through a security fence at his medium security facility. When the BOP responded by placing him in the SHU, he spiraled into psychosis, became suicidal, refused to eat and had a series of volatile interactions with BOP staff. BOP responded punitively to this mental health crisis. It prolonged segregation, forfeited his good time credits so that three months were added to his sentence, and deprived him of commissary and the phone access that he relied on to speak with his only source of support, his parents. Most concerning of all, BOP recently transferred Mr. Cratty from a medium security facility to the high security United States Penitentiary at USP Canaan. USP Canaan has a documented history of violence, inmate death and rampant drug trafficking activity.

Mr. Cratty, a non-violent drug offender, is at grave risk in the predatory environment of USP Canaan. He has serious mental and physical illness. He is bipolar, has major depressive disorder, severe opioid and cannabis use disorders and personality disorders that make him paranoid and delusional. He also has a longstanding and painful gastrointestinal condition and requires a special diet due to his loss of teeth (many of which were extracted during his imprisonment). We ask the Court to intervene now to reduce Mr. Cratty's sentence by some twelve months (from the time of filing) to time served. To best effectuate treatment for Mr. Cratty, we ask the court to order his immediate placement in a residential treatment program for at least six months from date of release, with coordinated psychiatric medication management, and step-down transitional housing. As of the time of this filing, Mr. Cratty has served some 74 months of his 96-month sentence. Before the wrongful forfeiture of his good-time credits, his projected release date had been at the end of this year—December 24, 2026, ten months from the date of this filing. The requested sentence reduction and release plan is supported by the 18

U.S.C. § 3553(a) factors and presents a far greater likelihood of furthering Mr. Cratty's rehabilitation and the safety of the community than keeping him in the dangerous, high-security environment of a United States Penitentiary.[1]

## II.      RELEVANT BACKGROUND

### A.      History of this Motion

On June 23, 2025, Mr. Cratty's parents, Jill Nussinow and Rick Cratty, petitioned the court for appointment of counsel because they believed their son's mental condition was critically compromised.  Dkt. 172 (Petition for Appointment of Counsel).  His parents told the Court that Mr. Cratty was at FCI Butner for mental health treatment.  *Id*.  Three weeks before they filed their request, the parents stated their son had suffered illness that the prison did not address adequately, and as a result had been placed in the Special Housing Unit (SHU).  *Id*.  When released from the SHU, Mr. Cratty suffered a psychological breakdown.  *Id*.  He ran into a security fence.  *Id*.  Guards returned him to the SHU, this time under suicide watch.  *Id*.  The parents noted that they feared their son's life was in danger due to the severity of his mental condition.  *Id*.  They also noted that, despite the Court's sentencing recommendation, FCI Butner had rejected him from the RDAP program.  *Id*.  On August 1, 2025, the Court appointed undersigned counsel to assist Mr. Cratty in filing a motion for reduction of sentence.  Dkt. 173 (Appointment of Counsel).  Since appointment, undersigned counsel has investigated Mr. Cratty's treatment in BOP custody, obtained copious medical records from BOP and conferred with Mr. Cratty, his parents, and an organization assisting him in trying to obtain better medical treatment.  Declaration of Mary McNamara ("McNamara Decl.") ¶ 2.  Mr. Cratty's care has deteriorated further.  Counsel now files the instant motion.

---

[1] Without good time credits, which the BOP has forfeited after three incidents in June 2025 discussed herein and one incident at USP Canaan, Mr. Cratty's projected release date is now April 11, 2027.  It had been December 24 of this year.  *See* https://www.bop.gov/inmateloc/, last visited February 20, 2026.

**B.      Mr. Cratty's Childhood and Personal Background**

Mr. Cratty grew up in Santa Rosa, California.  PSR ¶ 51.  His mother describes him as "a regular kid" until the age of eight, when he started to play video games.  *Id*. ¶ 58.  He had difficulty disengaging from them and would become argumentative.  *Id*.  Mr. Cratty remembers spending long stretches home alone, learning early to manage his emotions and anxiety largely by himself.  *Id*. ¶ 52.  He had behavioral problems in school, was expelled from one, and went to a succession of others.  *Id*.  In middle school he was exposed to drugs and peers who treated skipping class as normal.  *Id*.

Mr. Cratty has suffered from mental illness and addiction since a young age.  He has had anxiety and depression for as long as he can remember.  *Id*. ¶ 62.  At age sixteen or seventeen, he was diagnosed with ADD and prescribed stimulants, including Ritalin and Adderall.  *Id*.  He began smoking marijuana at age fourteen, by sixteen he was using methamphetamine daily for weeks at a time to cope with anxiety.  *Id*. ¶ 66.  He later experimented with ketamine.  *Id*.  He drank alcohol and used crack and powder cocaine.  *Id*.

Mr. Cratty was an intelligent boy.  He passed the high school proficiency exam at age 15, despite his ADD.  *Id*. ¶ 58.  But his mental illness and drug addiction led him to become a stranger to his parents.  He was also not eating every day, often did not have clean clothes, and regularly slept on friends' couches.  *Id*. ¶¶ 53, 58.  Also at age 15,  Mr. Cratty started to experience episodes of vomiting that could last twenty-four to forty-eight hours at a time.  *Id*. ¶ 58.  He was diagnosed with cyclic vomiting syndrome, a condition often triggered by anxiety and stress which is difficult to control and has no cure.[2] *Id*.  At eighteen, he was in a car accident that caused a herniated disc and nerve pain.  *Id*. ¶ 61.  His vomiting episodes became more frequent and severe, leading to dehydration and major complications, including a torn stomach lining, blood in the lungs, and pneumonia.  *Id*.  A second accident later worsened his back injuries and caused more nerve pain.  *Id*.

---

[2] Mayo Clinic Staff, *Cyclic Vomiting Syndrome: Symptoms & Causes*, Mayo Clinic (Sept. 20, 2025), https://www.mayoclinic.org/diseases-conditions/cyclic-vomiting-syndrome/symptoms-causes/syc-20352161 (last visited Feb. 20, 2026).

To deal with the pain from the injuries, Mr. Cratty was prescribed oxycodone. *Id*. ¶ 67; Declaration of Jill Nussinow ("Nussinow Decl.) ¶ 9. He became addicted to it and transitioned from pills to injecting heroin and then fentanyl. Nussinow Decl., ¶ 9.

Mr. Cratty has tried to break free from addiction. In 2016, he entered an in-person rehabilitation program for 30 days and did well in the structured environment. PSR ¶¶ 58, 70. A clinician from the program noted that he "made significant strides in his recovery while in residential treatment[.]" *Id*., ¶ 70. However, the program was too short, and Mr. Cratty relapsed after leaving it. *Id*. ¶ 58.

### C.     The Offense Conduct, Plea Negotiations and Sentencing

In September 2019, Mr. Cratty participated in a chain of events that led to the tragic deaths of Patrick O'Neil and his one-year-old son. *Id*. ¶¶ 7, 10. Mr. O'Neil, who had suffered drug addiction but had been 120 days sober at the time of the events, contacted a man referred to as T.B. for fentanyl several times the day before his death. *Id*. ¶ 9; Dkt. 101 (Cratty Sentencing Memo) at 2; McNamara Decl., Exhibit A (Sentencing Transcript) at 8. T.B. then contacted A.E. PSR ¶ 9. A.E. texted Lindsay Williams to get a price for the fentanyl. *Id*. Williams said she could get the fentanyl after work from someone who worked at a car stereo store (Leanna Zamora). *Id*. Mr. Cratty arrived at T.B.'s house later that afternoon. *Id*. ¶ 10. Mr. Cratty drove Ms. Williams to buy fentanyl for O'Neil. *Id*. Mr. O'Neil followed behind them in his car. *Id*. Ms. Williams met her source, Zamora, in a parking lot, picked up the fentanyl, and returned to Mr. Cratty's car. *Id*. For some reason, Mr. Cratty took the fentanyl from Williams and handed it to the waiting Mr. O'Neil. *Id*. Mr. Cratty did not receive any money for giving Ms. Williams a ride to her source or for handing the fentanyl to Mr. O'Neil. In Mr. Cratty's mind, he was simply doing Ms. Williams a favor.

After Mr. O'Neil received the fentanyl, he returned to T.B.'s house and he, A.E. and A.E.'s girlfriend went into the garage and used some of it. *Id*. ¶ 11. Later that night Mr. O'Neil took fentanyl again while at his apartment. *Id*. ¶ 14. Mr. O'Neil lost consciousness. *Id*. He had physical custody of his infant son that night because Mr. O'Neil's girlfriend, Emily Guillory, had

given the baby to Mr. O'Neil for an overnight stay. *Id*. ¶ 12. While he was unconscious, the baby came into contact with some of the unused fentanyl. *Id*. ¶ 14. When she did not hear from Mr. O'Neil the next day, Ms. Guillory went to Mr. O'Neil's apartment and found him and the baby. *Id*. ¶ 13. The baby was already dead. *Id*. ¶ 14. Mr. O'Neil was unresponsive. *Id*. He died in hospital. *Id*.

Mr. Cratty, Ms. Williams, and Ms. Zamora were indicted on December 12, 2019 for (1) violation of 21 U.S.C. § 846 – Conspiracy to Distribute Fentanyl and (2) 21 U.S.C. § 841(a)(1) and (b)(1)(C) – Distribution of Fentanyl Resulting in Serious Bodily Injury and Death. Dkt. 2 (Indictment). It does not appear that TB or AE were charged. On March 17, 2021, Mr. Cratty pled guilty under Rule 11(c)(1)(C) to the conspiracy count. PSR ¶ 2. During plea negotiations, the parties agreed that a significantly below Guidelines sentence of between 84 and 96 months was appropriate in Mr. Cratty's case. *See* Plea Agreement. Although Mr. Cratty's Criminal History Category was VI, his record consisted primarily of state court drug-related offenses. PSR ¶¶ 33-41. For his role in this tragedy, the Court sentenced Mr. Cratty to 96 months in prison. Dkt. 122 (Judgment). At sentencing, both Ms. Guillory and Mr. O'Neil's mother spoke to the Court. Ms. Guillory gave an extraordinary statement. She spoke of the searing pain of losing her baby and her boyfriend. McNamara Decl., Exh. A at 14-20. She spoke of the need for personal accountability and the toll drug addiction had on Mr. O'Neil, Mr. Cratty, Ms. Williams and on Ms. Guillory herself. *Id*. She spoke of the work she had done to recover from addiction and to remake her life. *Id*. She pleaded with Mr. Cratty and Ms. Williams to get treatment for their addiction while in prison. *Id*. She spoke of the community in the grip of a drug epidemic with, as she said, people dying every single day. *Id*.

### D. Mr. Cratty's Custodial Adjustment at Santa Rita Jail

On December 11, 2019, Mr. Cratty was arrested. PSR ¶ 5. He was denied bail and remained in custody throughout the pendency of the criminal case. *Id*. He was incarcerated at Santa Rita Jail, where he remained until his transfer to BOP custody in March 2022—a span of two and a quarter years. Declaration of Shane Cratty ("Cratty Decl."), ¶ 2. During that entire

period, he had only one minor disciplinary violation for having a torn sheet (which is common in jails so that inmates can tie the ends to the bed to stop the sheet from slipping). *Id.* He remained opioid free and was in the Medication Assisted Treatment ("MAT") program taking Subutex, a medication used to treat opioid addiction. *Id.* He received his prescribed medications consistently—Wellbutrin for major depressive disorder and Doxepin for depression and anxiety. *Id.* Santa Rita also accommodated his significant medical needs. *Id.* For example, after multiple dental extractions, the jail supplied him with a dental appliance (a sort of denture) as well as a gastric soft diet to help him chew. *Id.* Regular and consistent mental-health medication, treatment of his gastric illness, and drug rehabilitation including the use of Subutex allowed Mr. Cratty to function in jail and be both sober and stable.

### E.      Mr. Cratty's Custodial Adjustment in BOP Custody

Mr. Cratty's adjustment in the BOP has been the opposite of his time at Santa Rita. His mental health deteriorated markedly because the care and treatment he received at Santa Rita was either inconsistently administered or entirely absent in BOP. The poor care has caused acute flare ups of mental illness and serious lapses in sobriety.

BOP's recognition of the seriousness of Mr. Cratty's mental illness contrasts with the poor level of care he has received. BOP providers have diagnosed him with the following disorders: bipolar disorder; major depressive disorder, recurrent; post-traumatic stress disorder; severe opioid use disorder; severe cannabis use disorder; attention-deficit hyperactivity disorder; and Cluster B personality disorders. McNamara Decl., Exhibit E (excerpts of Medical Records) at 114-115; McNamara Decl., Exhibit B (excerpts of Sheridan Medical Records) at 46. Cluster B disorders are characterized by emotional, anxious or erratic behaviors.[3] They can present as emotional volatility, impulsivity, poor distress tolerance, stress-related paranoia. They carry with them an elevated risk of exactly what occurred in this case—self-harm and destabilizing

---

[3] Mayo Clinic Staff, *Personality Disorders: Symptoms and Causes*, Mayo Clinic (July 14, 2023), https://www.mayoclinic.org/diseases-conditions/personality-disorders/symptoms-causes/syc-20354463 (last visited Feb. 20, 2026).

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

behavior under stress, particularly absent consistent, specialized care.[4] People who suffer from Cluster B conditions often turn to drugs to cope with overwhelming emotions, which serves only to sharpen paranoia and magnify emotional dysregulation.[5] As detailed below, the co-occurrence of bipolar and major depressive disorders along with Cluster B personality disorders has made adequate treatment of Mr. Cratty's symptoms in a prison setting dependent on consistency of treatment, provision of appropriate medications and effective management of drug addiction. He has received none of these components in BOP custody.

       1.       *FCI Sheridan—medication instability, dysregulated behavior.*

Mr. Cratty entered BOP custody at FCI Sheridan in March 2022. Cratty Decl., ¶ 3. Despite Mr. Cratty's severe mental illness, staff at FCI Sheridan initially placed him in the wrong tier of care—Mental Health Care Level 1—which is designed for inmates who are self-sufficient in the prison system and require minimal clinical oversight. *Id.* He was changed to the still inadequate Mental Health Care Level 2—for those unlike Mr. Cratty with largely stable conditions managed by medication—four months later. *Id.* By then, Mr. Cratty's condition had markedly deteriorated.

On arrival, Sheridan did not provide him with Wellbutrin and Doxepin, the psychiatric medications for major depressive disorder that he had been receiving and was stable on while at Santa Rita. *Id.* Being off these medications caused Mr. Cratty acute sleep deprivation and auditory hallucinations. *Id.*; McNamara Decl., Exh. B at 42. He urgently requested his prescribed medications. He did not receive them. Cratty Decl., ¶ 3; McNamara Decl., Exh. B at 42. In addition, Mr. Cratty's dental appliance was taken away, and he was never fed the required gastric soft diet. Cratty Decl., ¶ 4. After being off medication and tormented by sleeplessness and voices in his head, he ingested a nerve pain medication called Oxcarbazepine to try to

---

[4] *Cluster B Personality Disorders: What They Are & Traits*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/cluster-b-personality-disorders (last visited Feb. 20, 2026).

[5] Khrystyna Stetsiv, Ian A. McNamara, Melissa Nance & Ryan W. Carpenter, *The Co-Occurrence of Personality Disorders and Substance Use Disorders*, 25 Curr. Psychiatry Rep. 545 (2023), https://doi.org/10.1007/s11920-023-01452-6.

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

substitute for Doxepin to sleep. *Id*. ¶ 3. When staff observed that he was unable to stand, they physically abused him, took him to the hospital, and then placed him on suicide watch where he remained for five days. *Id*. After his third day on suicide watch, Mr. Cratty finally received Doxepin, but he never was provided with Wellbutrin. *Id*.

With the deterioration of his mental health due to lack of proper medication, Mr. Cratty's stress levels spiked. Cratty Decl., ¶ 5. He relapsed and began smoking K2, a synthetic marijuana readily available at Sheridan. *Id*. K2 is known to have severe adverse health effects including hallucinations, anxiety, agitation, unconsciousness, tremors, seizures, and vomiting, among others.[6] Mr. Cratty began to self-harm. In June 2022, he attempted suicide using a bedsheet and was stopped only because his cellmate witnessed him hanging the sheet on the bars in the window and intervened. Cratty Decl., ¶ 5; McNamara Decl., Exh. B at 52-53. In August 2022, Mr. Cratty ingested 15 Tylenol pills. He never received Wellbutrin. Cratty Decl., ¶ 5; McNamara Decl., Exh. B at 53.

BOP's response to these incidents was often segregation and discipline, which only worsened Mr. Cratty's mental distress. Cratty Decl., ¶ 6. He was repeatedly placed in the SHU, spending substantial time in segregation. *Id*. He went on hunger strike. McNamara Decl., Exh. B at 44. The result was a self-reinforcing cycle: deteriorating symptoms produced crises; crises triggered isolation and disciplinary sanctions; and isolation further worsened the very symptoms driving the behavior. Mr. Cratty's despair deepened further because he was having difficulty chewing his food due to the number of missing teeth he had—staff took his dental appliance during the Oxcarbazepine incident and did not give it back. *Id*. ¶ 4. He never received a gastric soft diet. *Id*.

2.  *FCI Butner—profound deterioration in mental and physical health*

In July 2023, Mr. Cratty was transferred to FCI Butner II Medium. Cratty Decl., ¶ 6. The Court had recommended him for the Residential Drug Abuse Program ("RDAP"). Dkt. 122

---

[6] U.S. Drug Enf't Admin., *K2/Spice Drug Fact Sheet*, https://www.dea.gov/sites/default/files/2025-01/K2-Spice-Drug-Fact-Sheet.pdf (last visited Feb. 20, 2026).

at 2. Mr. Cratty wanted this treatment—he was desperate to receive intensive treatment for his opioid use disorder and to be able to manage his mental health without drugs. Cratty Decl., ¶ 6. Butner had a well-regarded dual-diagnosis RDAP program, one of the few in the country. For Mr. Cratty, the transfer thousands of miles away from his parents was a worthwhile sacrifice to get the treatment he longed to receive. *Id*. Once at Butner he was housed in the RDAP unit, but he was not placed in the program. *Id*. ¶ 7. Instead, he was left on a waitlist for a year and received only minimal services rather than the full treatment or any of the benefits tied to program completion. *Id*. That prolonged limbo was destabilizing, and as time passed, his frustration turned to hopelessness. *Id*. Without intensive treatment, and still without Wellbutrin, he again relapsed and was removed from the program pipeline. *Id*. This returned Mr. Cratty to the same cycle of mental illness flare ups met with punitive responses that worsened his condition.

Mr. Cratty also underwent further dental extractions that left him unable to chew normal food. *Id*., ¶ 8; McNamara Decl., Exhibit C (excerpts of Butner Medical Records) at 54-56. He currently has only 13 teeth remaining. Cratty Decl., ¶ 8. Yet, as at Sheridan, Butner did not provide him the soft meals he needed. *Id*. That meant he either went hungry or tried to eat food that was painful or impossible to chew. At this point, Mr. Cratty had already been without a gastric soft diet for more than two years. *Id*. This daily, long-term and avoidable hardship became another source of stress and pain. None of Mr. Cratty's basic medical needs were being met. His ability to regulate his symptoms was further eroded.

In the months leading up to the June 2025 incident that caused Mr. Cratty's parents to ask the Court to appoint a lawyer for him, Mr. Cratty became highly unstable. *Id*. ¶ 9. From February through May 2025, he had recurrent vomiting and increasingly erratic eating patterns. *Id*.; McNamara Decl., Exh. C at 57-71. He was not compliant with medication. Cratty Decl., ¶ 9; McNamara Decl., Exh. C at 72. He was using drugs and became more and more agitated. Cratty Decl., ¶ 9. On May 29, Mr. Cratty began vomiting blood and had paranoid delusions. *Id*.; McNamara Decl., Exh. C at 73-75. The staff did not help him because they viewed his symptoms as purely drug-related. Cratty Decl., ¶ 9.

9

On June 3, 2025, the incident reported to the Court by Mr. Cratty's parents occurred. This was the first of three incidents that the BOP punished as disciplinary violations, resulting in the deprivation of Mr. Cratty's good time credits and heightening his security level to high, resulting in a transfer to a United States Penitentiary. During the incident, Mr. Cratty had a drug-induced psychotic break and attempted to run head-first through a metal gate and then ran to the lieutenant's office. *Id*. ¶ 10. He was subdued there by three staff members and taken to the SHU, where he was placed on a concrete slab in painful restraints with his hands shackled to the slab together over his head (producing a painful extension in one shoulder) and his feet chained apart at the bottom of the slab. *Id*. He sustained lacerations to his forehead and nose (from crashing into the gate) and on his arms and feet from being dragged and later restrained. *Id*. BOP kept him in the SHU and did not provide mental health treatment. *Id*.; McNamara Decl., Exh. C at 76-77. Instead, he was charged with assault without serious injury (attempt) and threatening bodily harm. Cratty Decl., ¶ 10; McNamara Decl., Exhibit D (Disciplinary Records) at 102-105.

The second incident occurred on June 9, while Mr. Cratty was still in the SHU. Mr. Cratty told staff he was experiencing a mental health crisis and was not receiving adequate treatment. Cratty Decl., ¶ 11. Out of desperation, he told the officer on duty that if Psychology was not contacted, he would cover his cell window to force staff to respond to him. *Id*. When staff failed to respond to his cries for help, Mr. Cratty covered the window. *Id*. A lieutenant arrived at his cell and ordered Mr. Cratty to uncover the window. *Id*. Mr. Cratty complied and told the lieutenant he was experiencing a mental health crisis and needed to see Psychology staff. *Id*. The lieutenant restrained him and began to verbally abuse him. *Id*. The lieutenant then brought him to a dry cell with no cameras. *Id*. Two other officers joined the lieutenant and the lieutenant slammed Mr. Cratty to the back of the cell, ordered him to strip naked, verbally abused him with sexually demeaning language (calling him a "little bitch" and telling him he was "not a man") and grabbed his left buttock. *Id*. The lieutenant put him in a paper suit, applied wrist shackles tied to a waist chain with a black restraint box, and continued the verbal abuse. *Id*. After the required medical assessment following the use of restraints, Mr. Cratty

informed medical staff that he had been sexually abused and requested to file a complaint under the Prison Rape Elimination Act (PREA),[7] which he subsequently did. *Id*.; McNamara Decl., Exh. C at 78-82. The lieutenant then filed an incident report charging him with misusing a security device (covering the cell window).[8] Cratty Decl., ¶ 11; McNamara Decl., Exh. D at 106-109.

On June 12 or 13, Mr. Cratty asked to be placed on suicide watch, in part, out of fear of retaliation for filing the PREA claim. Cratty Decl., ¶ 12. While on suicide watch, he was denied clothing except for boxer shorts. *Id*. The temperature in the cell was extremely cold because the air conditioner was on full blast. *Id*. He was not provided soap and a towel to take a shower. *Id*. Mr. Cratty witnessed the death of the inmate in the adjacent cell after the inmate's call for help for chest pains went unanswered until he became unresponsive. *Id*. Mr. Cratty learned that the inmate who died had made similar allegations to those Mr. Cratty made against the lieutenant who abused him. *Id*.

By June 19, Mr. Cratty was both psychiatrically destabilized and physically depleted from lack of a proper diet. *Id*., ¶ 13. He initiated a hunger strike to call attention to the lack of a soft diet. *Id*.; McNamara Decl., Exh. C at 83-87 (noting Mr. Cratty had missed his ninth meal on June 22, 2025). It took six days for a physician to approve a soft diet and weeks for Mr. Cratty to receive it consistently. Cratty Decl., ¶ 13; McNamara Decl., Exh. C at 89-92. By this time,

---

[7] The Prison Rape Elimination Act provides that "[w]hen an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to protect the inmate." 28 CFR § 115.62. BOP never took action to assess Mr. Cratty's risk of being sexually harassed or violated, much less protect him from such abuse. PREA also makes clear that "for the purpose of disciplinary action, a report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation." *Id*., § 115.78(f). BOP violated these principles in its treatment of Mr. Cratty.

[8] BOP Policy Statements make clear that"[d]isciplinary action may not be capricious or retaliatory" and forbids the use of restraint equipment as a method of punishing an inmate. PS 5270.09 and 28 CFR § 541.1; PS 556606, 6(h)(1).

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

Mr. Cratty weighed only 130 pounds, down from the 190 pounds listed in the PSR ¶ 59. Cratty Decl., ¶ 13; McNamara Decl., Exh. C at 91.

Between June 19 and June 29, Mr. Cratty had repeated bouts of chest pain. Cratty Decl. ¶ 14; McNamara Decl., Exh. C at 93-99. His paranoia increased and he believed that BOP staff was waiting for him to die. Cratty Decl., ¶ 14. On or around June 27, a psychologist did come to his cell, but it was while Mr. Cratty was unclothed and using the toilet. *Id*. With the memories of the lieutenant's sexualized behavior toward him fresh in his mind, Mr. Cratty panicked. *Id*. He perceived that the psychologist was staring at him and told the compound officer that he intended to file a PREA complaint against the psychologist. *Id*. In retaliation, staff did not bring him dinner that evening. *Id*. Mr. Cratty then got into a dispute with the staff when he withheld a toilet plunger until he received food. *Id*. Staff handcuffed him and slammed him into a glass window. *Id*. The next morning, Mr. Cratty protested the lack of food by sticking his arm through the door slot. *Id*., ¶ 15. Guards responded by hit his arm against the door slot, injuring his elbow. *Id*. Mr. Cratty began to experience chest pains again. *Id*. While staff did administer an EKG, they did so without a doctor's being present and seemed unsure about the results, leaving Mr. Cratty confused and afraid. *Id*.

The third incident that resulted in discipline and punishment occurred on June 29, when a correctional officer came to remove his tear-resistant blanket because Mr. Cratty had been covering his head with it in an effort to stay warm. Cratty Decl., ¶ 16. When Mr. Cratty refused to surrender his blanket, two officers and the lieutenant came into the cell and assaulted him. *Id*. Mr. Cratty began to slip and briefly held onto the officer's wrist. *Id*. Staff immediately restrained Mr. Cratty and took him to the SHU where Mr. Cratty again went on hunger strike. *Id*.; McNamara Decl., Exh. C at 100-101. After several hours, they returned him to suicide watch. Cratty Decl., ¶ 16.

A fourth event occurred on July 9, when Mr. Cratty disclosed to a psychologist that he was experiencing auditory hallucinations instructing him to kill her and other staff members, including the warden because they were dehumanizing the inmates. *Id*., ¶ 17. Mr. Cratty told the psychologist specifically that he was disclosing this information out of concern for staff

safety and his own safety and to prevent himself from acting on thoughts he recognized as dangerous. *Id*. Rather than treating this disclosure as a psychiatric emergency, the psychologist documented the incident as a disciplinary matter, writing Mr. Cratty up for making threats. *Id*.

On July 10, 2025, the day after Mr. Cratty's report of psychotic hallucinations, and while he remained on suicide watch, the BOP held disciplinary hearings on the three June incidents.[9] Cratty Decl., ¶ 18. The hearing officer disposed of all three in a total of approximately five minutes each. *Id*.; McNamara Decl., Exh. D at 102 (June 3 DHO hearing on July 10 at 0728hrs); 106 (June 9 DHO hearing on July 10 at 0733hrs); 110 (June 29 DHO hearing on July 10 at 0739hrs). Even though Mr. Cratty explained to the hearing officer that he had been suffering a mental health crisis at the time of the incidents and was not in a mental state where he could properly defend himself, the hearing officer sustained each charge and imposed the maximum available punishment. Cratty Decl., ¶ 18; McNamara Decl., Exh. D at 104-105, 108-109, 112-113. BOP forfeited approximately three months of good-conduct time (approximately one month per incident). Cratty Decl., ¶ 18; McNamara Decl., Exh. D at 104-105, 108-109, 112-113. This lengthened Mr. Cratty's sentence, altering his release date from December 24, 2026 to March 15, 2027. Cratty Decl., ¶ 18. BOP also stripped him of key stabilizing supports, including access to the telephone and email, which cut off the vital line of communication to his parents. *Id*.; McNamara Decl., Exh. D at 104-105, 112-113. He was also deprived of his access to commissary, which was important to his obtaining a reliable supply of soft food he could chew. Cratty Decl., ¶ 18; McNamara Decl., Exh. D at 104-105, 112-113. These punishments contravene governing regulations, which require BOP to take into consideration an inmate's mental illness to determine whether and to what extent an inmate should be punished.[10]

Mr. Cratty appealed these decisions, explaining that he was having a mental health crisis during these incidents and was not competent to participate in the proceedings while still on

---

[9] Undersigned counsel does not have information regarding the disciplinary action taken in response to the July 9 incident.

[10] BOP's regulations explicitly specify that the disciplinary process shall consider whether an inmate's mental disabilities or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed. 28 CFR § 115.78(c).

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

suicide watch. Cratty Decl., ¶ 19. In contravention of its own response mandates, BOP issued no response. *Id.*; PS § 542.18. BOP apparently relied on these disciplinary findings to raise Mr. Cratty's security classification from medium to high. On November 12, Mr. Cratty was informed of this latest punishment and told that he would be transferred to a United States Penitentiary. *Id.*, ¶ 20. After three weeks of transport, he arrived at his new institution—USP Canaan—in December 2025. *Id.* Mr. Cratty, a non-violent drug offender, remains at high security USP Canaan currently.

### 3. USP Canaan—an especially dangerous high-security penitentiary

Recent media reports and DOJ statements establish that USP Canaan is a high-risk environment marked by inmate deaths, serious violence, rampant drug trafficking and recurring security failures. In November 2025, for example, an inmate was convicted of voluntary manslaughter after using a seven-inch shank in a fatal stabbing inside a housing unit.[11] In May 2025, an inmate was sentenced for an assault with a dangerous weapon after stabbing another person in the prison's outdoor recreation yard. A co-defendant had previously been sentenced for the same offense conduct.[12] Reporting reflects that inmate deaths at USP Canaan have been investigated as suspicious, including a December 2024 death where the cause and manner were pending autopsy and a July 2025 incident where an inmate was found unresponsive and later pronounced dead.[13] And beyond physical violence, DOJ announcements have described

---

[11] Press Release, U.S. Att'y's Off., Middle Dist. of Pa., *Federal Inmate at USP Canaan Convicted of Voluntary Manslaughter* (Nov. 24, 2025), https://www.justice.gov/usao-mdpa/pr/federal-inmate-usp-canaan-convicted-voluntary-manslaughter (last visited Feb. 20, 2026).

[12] Press Release, U.S. Att'y's Off., Middle Dist. of Pa., *Inmate Sentenced to 72 Months' Imprisonment for Assault With a Dangerous Weapon* (May 2, 2025), https://www.justice.gov/usao-mdpa/pr/inmate-sentenced-72-months-imprisonment-assault-dangerous-weapon (last visited Feb. 20, 2026).

[13] Emily Cherkauskas, *Federal Inmate Death Investigation at USP Canaan*, FOX56 WOLF (Dec. 31, 2024), https://fox56.com/news/local/federal-inmate-death-investigation-at-usp-canaan (last visited Feb. 20, 2026); Kimberly Izar, *Inmate Death in Wayne County's USP Canaan Prison*, RADIO CATSKILL (July 28, 2025), https://wjffradio.org/inmate-death-in-wayne-countys-usp-canaan-prison/ (last visited Feb. 20, 2026).

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

contraband/drug-trafficking at USP Canaan, including a case involving attempted fentanyl trafficking, further highlighting the lack of institutional control and security.[14]

For Mr. Cratty, placement in a USP is especially dangerous. At lower security facilities like Sheridan and Butner, BOP failed to provide him with proper medication and failed to place him in the correct tier of mental health care. Instead, BOP addressed his mental illness through discipline. At lower security facilities, BOP also failed to provide him a safe, drug-free environment. Because of these failures, Mr. Cratty repeatedly relapsed, decompensated into psychosis and declined medication that was not his prescribed Wellbutrin and Doxepin. Stress compounded his symptoms and rendered him vulnerable to punitive and inappropriate staff response. At a high security penitentiary like USP Canaan, Mr. Cratty's situation will be and already is far worse. At Canaan, he is exposed to the danger of extreme violence from other inmates. High-security federal penitentiaries house prisoners who are among the system's most dangerous, including many serving life sentences. Violent, racially organized prison gangs are pervasive. Experts describe these institutions as highly predatory environments where vulnerable prisoners, including those with mental illness, face heightened risk of assault if unaffiliated with a prison gang and may feel compelled to seek protection from race-based groups.[15] Inmates operate in a war zone, where exertion of power over others is the governing principle. *Id*. A National Institute of Justice paper concluded that gang control, contraband and violence are top-tier concerns in high-security environments and drive many assaults and homicides behind bars.[16]

---

[14] Press Release, U.S. Att'y's Off., Middle Dist. of Pa., *Federal Inmate and Texas Resident Charged With Attempting to Introduce Fentanyl Into a United States Penitentiary* (May 29, 2024), https://www.justice.gov/usao-mdpa/pr/federal-inmate-and-texas-resident-charged-attempting-introduce-fentanyl-united-states (last visited Feb. 20, 2026).

[15] *High-Security Prisons | United States Penitentiary*, (last updated May 16, 2025), https://federalcriminaldefenseattorney.com/prison-life/prison-security-levels/high-security-prisons/.

[16] National Institute of Justice, *Experts Identify Priority Needs for Addressing Correctional Agency Security Threats* (Apr. 6, 2020), https://nij.ojp.gov/topics/articles/experts-identify-priority-needs-addressing-correctional-agency-security-threats.

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

In a facility like USP Canaan, these pressures will mean that Mr. Cratty will almost certainly have to join a gang, and in his case, it will have to be the white-identified one, i.e., the Aryan Brotherhood. Cratty Decl., ¶ 21. But he will not find safety there due to his severe mental illness. In other words, the same conditions that have already driven Mr. Cratty into suicide watch, hunger strikes, and crisis confinement are strongly amplified in a high-security penitentiary. This time, the danger will come not only from BOP's lack of proper medical care and its inappropriate punishment of him, but from violent fellow inmates.

Mr. Cratty has already experienced these dangers. Gangs control USP Canaan, and, as far as he can tell, all inmates appear armed with shanks for protection. *Id*. Mr. Cratty is terrified of being attacked due to his mental and physical illness. *Id*. The prison is frequently on lockdown due to violence, which means Mr. Cratty can leave his cell only to shower three times per week. *Id*. Further, BOP's failure to provide adequate mental and medical health care continues. Mr. Cratty informed the head psychologist at Canaan that he had been having suicidal thoughts. *Id*. She offered to see if he could participate in the Challenge Program, a cognitive-behavioral residential treatment program for inmates at certain USPs.[17] Yet Mr. Cratty continues to wait for admission while others who arrived at Canaan with him have been admitted to the program. *Id*. Mr. Cratty still has not received a gastric soft diet even though the doctor renewed the order weeks ago. *Id*.

## III. LEGAL STANDARD

Under the First Step Act, courts may reduce a previously imposed sentence after a defendant has exhausted all administrative remedies where (1) "extraordinary and compelling reasons warrant such a reduction"; and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3852(c)(1)(A). In determining whether release is warranted, courts also consider "the factors set forth in section 3553(a) to the extent that they are applicable." *Id*.

---

[17] U.S. Dep't of Justice, Fed. Bureau of Prisons, First Step Act Approved Programs Guide, 9 (Reentry Servs. Div. Sept. 2023), https://www.bop.gov/inmates/fsa/docs/fsa_guide_eng_2023.pdf

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

U.S.S.G. § 1B1.13 and its application notes provide the applicable policy statement and set out six "extraordinary and compelling reasons" that warrant a sentence reduction: (1) the defendant's medical circumstances; (2) the defendant's age; (3) the defendant's family circumstances; (4) whether the defendant was abused in custody; (5) other reasons; and (6) changes in the law if the defendant received an unusually long sentence. U.S.S.G. § 1B.13. Section 1B1.13(b)(1)(C) permits courts to grant compassionate release if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at serious risk of deterioration in health or death."

Section 1B1.13(b)(5), known as the "residual exception," permits courts to grant compassionate release based on "any circumstances or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to" the reasons explicitly enumerated. *Id*. The Sentencing Commission "considered but specifically rejected a requirement that 'other reasons' be similar in *nature and consequence* to the specified reasons." *See* Nov. 1, 2023 Amendments to U.S.S.G. at 10 (quoting First Step Act § 603(b)) (emphasis added). "Rather, they need be similar only in *gravity*, a requirement that inheres in the statutory requirement that they present extraordinary and compelling reasons for a sentence reduction." *Id.* (emphasis added).

## IV. ARGUMENT

### A. Mr. Cratty Has Exhausted His Administrative Remedies

On December 5, 2025, undersigned counsel submitted a request for compassionate release under section 3582(c) to the warden at USP Canaan. McNamara Decl., Exhibit F (Letter to Warden of USP Canaan). On January 6, 2026, the warden rejected the request. *Id*., Exhibit G (Letter from Warden of USP Canaan).

## B. Extraordinary and Compelling Reasons Warrant a Reduction in Mr. Cratty's Sentence

### 1. The BOP's inability to provide adequate mental health care to Mr. Cratty is an Extraordinary and Compelling Reason for Release

Courts in this Circuit and others have found that compassionate release is warranted when a defendant suffers from a medical condition that requires "long-term or specialized medical care" that "is not being provided" and, without it, the defendant is at "serious risk of deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C); *see also United States v. Beck*, 425 F. Supp. 3d 573, 582-84 (M.D.N.C. 2019) (BOP's failure to timely treat inmate's breast cancer constituted extraordinary and compelling reason justifying release); *United States v. Hougen*, No. 5:20-CR-00432-1 EJD, 2025 WL 798604, at *2 (N.D. Cal. Mar. 10, 2025) (extraordinary and compelling reason existed where "the Court does not have sufficient confidence that BOP or its outside hospital can provide the necessary care" to an inmate with end-stage liver disease); *United States v. Sanders*, No. 2:13-CR-00312-KJM, 2021 WL 78869, at *1 (E.D. Cal. Jan. 6, 2021) ("FCI Florence has shown itself incapable or unwilling to treat [defendant's] medical condition by not providing him with further evaluation or treatment despite repeated high blood pressure readings in the span of four months"); *United States v. Coppin*, No. 2:16-CR-00223-KJM, 2020 WL 7646416, at *2-3 (E.D. Cal. Dec. 23, 2020) (finding extraordinary and compelling reasons where the BOP failed to treat inmate's elevated blood pressure and failed to perform an "urgent" colonoscopy despite ongoing colorectal bleeding, leaving him "not adequately cared for" and unable to provide self-care in custody, particularly in light of COVID-19 risk).

These cases demonstrate that when the BOP cannot or does not provide the sustained, specialized care a person needs to remain healthy, continued incarceration becomes medically untenable. The same principle applies here. Mr. Cratty's record shows that he requires long-term, specialized psychiatric care, structured substance-use treatment, and crucially, a drug-free environment to prevent recurrent crises. Yet neither FCI Sheridan nor FCI Butner could provide a drug-free environment. USP Canaan will not either. It has a documented history of rampant inmate drug trafficking. Indeed, the problem is pervasive throughout the BOP system. A 2024

report by the DOJ Office of the Inspector General noted the presence of contraband, including drugs and weapons, inside BOP facilities is at an all-time high, contributing to the deaths of nearly one-third of the inmate deaths within the scope of the review.[18]  Mr. Cratty's severe drug abuse disorders, together with his severe mental illness, make his placement at a USP extremely dangerous.

Mr. Cratty should not be at a USP in the first place.  In addition to its failure to provide a drug-free environment for Mr. Cratty, the BOP has treated his mental illness as a series of disciplinary violations and has responded largely through segregation, restraints, and discipline rather than medical stabilization.  As a result, both his mental and physical health have deteriorated dramatically in custody, placing him at serious risk of further deterioration and, given his history of suicidality and substance use disorder in custody, at serious risk of death.

Mr. Cratty's medical record reflects a psychiatric state that cannot be managed through the intermittent check-ups of Mental Health Care Level 2 or by segregation.  The BOP itself has diagnosed him with serious psychiatric conditions, including bipolar disorder, major depressive disorder, severe opioid and cannabis use disorder, and Cluster B personality disorders.  These conditions are associated with emotional dysregulation, impulsivity, and elevated self-harm risk when destabilized.  His history in BOP custody demonstrates that, absent total abstention from drugs and sustained stabilization, his symptoms escalate into crises: hallucinations, self-harming behavior, repeated hunger strikes, repeated placements on suicide watch and prolonged detention in the SHU.  This pattern shows that what he needs is not repeated and punitive responses, but long-term provision of a drug-free environment paired with drug treatment and specialized psychiatric care that can stabilize him over time, manage relapse risk, and prevent recurring crises.

The BOP has failed on all these fronts, even at specialized institutions like Butner.  The record establishes repeated gaps in treatment, limited access to meaningful programming, a

---

[18] U.S. Dep't of Justice, Off. of the Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, Rep. No. 24-041, at 54 (Feb. 2024), https://oig.justice.gov/sites/default/files/reports/24-041.pdf.

**Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

reliance on punitive custodial measures in place of care, and a complete failure to provide a drug-free environment. From early in his custody, Mr. Cratty reported serious symptoms and requested psychiatric medication, yet his care was marked by periods of medication noncompliance and disruption rather than close psychiatric follow-up and continuity. He sought structured substance-use treatment at Butner, transferring across the country and away from any hope of parental visitation, specifically for its RDAP program. Yet he was not admitted to the actual program after a year's wait and was therefore not provided with the treatment structure and benefits associated with it. He was ultimately removed from the waitlist after relapse.

The BOP likewise failed to reliably implement basic medical accommodations that could have helped stabilized his mental health conditions. His physical health deteriorated after BOP's failure to provide him a soft diet in the wake of extensive dental extractions. This was a recurring problem that caused him to lose weight precipitously and fueled his distress, further undermining his ability to function. Even during psychotic hallucinations, the institution's response was segregation and discipline, including disciplinary hearings conducted while he was on suicide watch, rather than a sustained treatment plan. BOP has repeatedly demonstrated the absence of consistent, long-term mental-health and substance-use care, coupled with repeated failures to meet basic needs. All these failures have deepened his mental illness and drug addiction.

The risk to Mr. Cratty's long-term health and now, his life, is clear. He has attempted suicide in custody, required repeated suicide-watch placements, and has repeatedly engaged in behaviors consistent with acute psychiatric crisis, including going on prolonged hunger strikes. He has also relapsed and is at risk of overdose. The June 2025 incidents illustrate the danger of continued custody without adequate stabilization. They occurred after months of warning signs, worsening symptoms, and escalating paranoia and despair. Mr. Cratty went on hunger strike, had bouts of chest-pain, and volatile interactions with staff. This culminated in repeated uses of force and yet more segregation. The BOP then imposed maximal punishments—extending his sentence, depriving him of contact with his parents and the ability to buy soft food in commissary. It has now moved him to a penitentiary with a documented history of inmate

violence and out-of-control drug trafficking, increasing both his likelihood of victimization and his exposure to substances that could precipitate relapse or fatal overdose. On this record, continued custody without intensive long-term, specialized psychiatric care of the sort that BOP has shown itself incapable of providing places Mr. Cratty at grave risk of further deterioration. Given his history of suicidality and substance use disorder in custody, it also exposes Mr. Cratty to serious risk of death.

        2.     *Alternatively, the Court Should Find Extraordinary and Compelling Reasons Under § 1B1.13(b)(5) Because the Lack of Adequate Mental-Health Care Is Similar in Gravity to Unmet Medical Care*

Even if the Court were to construe § 1B1.13(b)(1)(C) narrowly as principally addressing physical medical care, the same facts independently satisfy the guideline's residual provision. Section 1B1.13(b)(5) authorizes relief where a defendant presents "any other circumstance or combination of circumstances" that is "similar in gravity" to the enumerated reasons. U.S.S.G. § 1B1.13(b)(5); *United States v. Bryant*, 144 F.4th 1119, 1136 (9th Cir. 2025) (noting that extraordinary and compelling circumstances are "similar in gravity" "where continued incarceration risks a defendant's health or safety."). The failure to provide adequate mental health care is at least as grave as the failure to provide adequate treatment for a serious physical condition. Both involve a recognized, serious health condition and an institutional inability to deliver necessary care. In addition, both carry the same concern the policy statement highlights, a serious risk of deterioration or death. On this basis, the Court should find extraordinary and compelling reasons under § 1B1.13(b)(5) even if it declines to rest the decision on § 1B1.13(b)(1)(C).

**C.     Mr. Cratty is Not a Danger to the Community**

Mr. Cratty will return to the community at some point, either as the result of this motion or after twelve more months of incarceration. A carefully structured release to a residential treatment facility is a safer course than confining him in a dangerous USP, not only for Mr. Cratty, but for the community to which he will return. Releasing Mr. Cratty directly into a controlled, clinically supervised setting would reduce the likelihood of relapse and

destabilization and would provide a more reliable pathway to compliance and reintegration than continuing to keep him in a drug-infested penitentiary without adequate care until his eventual release.

Mr. Cratty is therefore asking to be released to treatment. Probation has advised undersigned counsel that Center Point in San Rafael offers a residential treatment program, which can be paired with psychiatric care by a local Marin County mental-health provider to manage psychiatric medications. The Court can order a minimum six-month residential placement as a condition of supervised release, followed by step-down transitional housing and continued treatment. Mr. Cratty also has loving support from his parents, who are prepared to assist with coordination, transportation, and accountability. This proposed plan aligns the conditions of release with the drivers of risk identified in the record—mental illness and substance use disorder. It also ensures that Mr. Cratty's return to the community occurs in the safest manner possible—under structure, supervision, and care, rather than after release directly from a penitentiary.

**D.      The § 3553(a) Factors Weigh in Favor of Reducing Mr. Cratty's Sentence**

The requested sentence reduction is consistent with the factors in 18 U.S.C. § 3553(a).

First, Mr. Cratty's history and characteristics strongly support a treatment-centered disposition. His background is defined by severe, longstanding mental illness, substance use disorder, and significant medical instability—conditions that have dramatically worsened in custody. After his arrest in December 2019, Mr. Cratty demonstrated while at Santa Rita that he can remain stable and avoid disciplinary issues when his basic medical needs are met, and his medications consistently administered. BOP has not provided these elements of care. Rather, it has endangered Mr. Cratty's health and safety.

Second, the purposes of sentencing under § 3553(a)(2) are better served by release to residential treatment than by continued confinement at a USP. Continued incarceration is not necessary to reflect the seriousness of the offense, promote respect for the law, or provide just punishment. Mr. Cratty has already served more than six years and two months in custody since

December 2019. His sentence has been particularly punishing, including his deteriorating mental and physical health and the unusually harsh conditions associated with prolonged segregation, suicide watch, crisis confinement, and now transfer to a USP. These punitive and restrictive conditions are relevant to the Court's assessment of what is "just" under § 3553(a). Moreover, specific and general deterrence are not advanced by continuing to confine a severely mentally ill person in an environment that does not provide the care required to stabilize him. Specific deterrence depends on reducing the drivers of recidivism, in this case: untreated psychiatric illness, relapse, and medical instability. A court-ordered residential program with strict rules and close Probation oversight is more likely to reduce future risk than continued incarceration in a setting where Mr. Cratty's mental health has demonstrably deteriorated.

Third, as explained above, the need to protect the public is addressed more effectively through a structured release plan into a residential treatment program than through ongoing custody followed by eventual unstructured release. If denied compassionate release, Mr. Cratty will be released into the community in some twelve months. It is better for the public, Mr. Cratty, and his family if Mr. Cratty's release into the community follows months of sustained treatment and support rather than a release after years of deepening mental illness and substance abuse.

Fourth, a sentence reduction would avoid unwarranted sentencing disparity and remain consistent with the purposes of supervised release. The Court can impose stringent conditions to ensure that Mr. Cratty's sentence continues to reflect accountability while also addressing the concrete medical and psychiatric failures that have made continued incarceration unusually dangerous for him. The Court can—and the defense urges it to—require residential treatment, mental-health treatment, substance-use treatment, testing, and a step-down plan. Supervised release is designed to facilitate safe reintegration; here, it can be tailored to ensure both structure and public protection.

The § 3553(a) factors support a reduction to time served with a robust set of supervised-release conditions requiring residential treatment and coordinated psychiatric care. That outcome best balances the seriousness of the offense with the reality of Mr. Cratty's deteriorating

23

health in custody for which BOP has not provided care, it promotes genuine rehabilitation, and offers the safest, most controlled pathway for his inevitable return to the community.

**V.      CONCLUSION**

Conditions that had been well-managed in custody at Santa Rita spiraled out of control in BOP custody.  Mr. Cratty cycled through periods of intense destabilization kicked off by discontinuation of his medication, resulting relapse into drug use, and BOP's punitive response to his mental illness.  BOP's decision to transfer Mr. Cratty from a medium-security facility to a high-security penitentiary exposes Mr. Cratty to extreme risk of violence and possibly, death, and will provide him with even less care than he received at lower-level security facilities.

For the reasons set forth above, we respectfully request that the Court grant Mr. Cratty compassionate release to an inpatient treatment facility.

Dated:                                               Respectfully submitted,

_____
Mary McNamara
Hannah Pollack
SWANSON & McNAMARA LLP
Attorneys for SHANE CRATTY