Mary McNamara, SBN 147131
mary@smllp.law
Hannah Pollack, SBN 336599
hannah@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant SHANE CRATTY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> SHANE CRATTY, <br><br> Defendant. | No.    CR 19-0681 CRB <br><br> **DECLARATION OF MARY MCNAMARA IN SUPPORT OF DEFENDANT SHANE CRATTY'S MOTION FOR COMPASSIONATE RELEASE** |

I, Mary McNamara, declare as follows:

1.      I am an attorney at law duly licensed to practice before the courts of the State of California and admitted to practice before this Court.  I am a partner at the law firm of Swanson & McNamara LLP and counsel of record for defendant Shane Cratty in the above-captioned matter.  I submit this Declaration in support of Mr. Cratty's motion for compassionate release.  Except where asserted on information and belief, the matters stated herein are within my personal knowledge, and, if called upon to testify thereto, I could and would competently do so.

2.      Since the Court appointed me as counsel for Mr. Cratty, I have investigated his eligibility for compassionate release, obtained copious medical and disciplinary records from BOP and conferred with Mr. Cratty, his parents, and an organization assisting in trying to obtain better medical treatment for him.

3.      Attached hereto as Exhibit A is a true and correct copy of the Sentencing Transcript, Docket No. 25 in the above captioned matter.

4.      Attached hereto as Exhibit B are true and correct copies of excerpts of Mr. Cratty's medical records from FCI Sheridan.

5.      Attached hereto as Exhibit C are true and correct copies of excerpts of Mr. Cratty's medical records from FCI Butner.

6.      Attached hereto as Exhibit D are true and correct copies of three Disciplinary Hearing Reports from disciplinary incidents involving Mr. Cratty.

7.      Attached hereto as Exhibit E is a true and correct copy of a list of Mr. Cratty's Health Problems from his BOP medical records as of January 22, 2026.

8.      Attached hereto as Exhibit F is a true and correct copy of a December 5, 2025 letter submitted by undersigned counsel to the warden at USP Canaan seeking compassionate release for Mr. Cratty.

9.      Attached hereto as Exhibit G is a true and correct copy of a January 6, 2026 letter from the warden at USP Canaan rejecting Mr. Cratty's request for compassionate release.

**Decl. of Mary McNamara ISO Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of February, 2026 at  San Francisco, California.

_____
Mary McNamara

**Decl. of Mary McNamara ISO Defendant Shane Cratty's Motion for Compassionate Release**
*United States v. Shane Cratty* CR 19-681 CRB

# EXHIBIT A

**Pages 1 - 41**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )   **NO. CR 19-00681-CRB**
                               )
LEANNA ZAMORA, LINDSAY BAIN    )
MUNIZ, and SHANE CRATTY,       )
                               )
            Defendants.        )
_____ )

San Francisco, California
Wednesday, November 10, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

STEPHANIE M. HINDS
Acting United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
BY:  **FRANK J. RIEBLI**
     **SAILAJA PAIDIPATY**
     **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Bain Muniz:

MOEEL LAH FAKHOURY LLP
1300 Clay Street - Suite 600
Oakland, California 94612
BY:  **SHAFFY MOEEL, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**0001**

**APPEARANCES**:   **(CONTINUED)**

For Defendant Cratty:

                  LAW OFFICE OF GREGOR GUY-SMITH
                  214 Duboce Avenue
                  San Francisco, California 94103
       BY:   **GREGOR D. GUY-SMITH, ATTORNEY AT LAW**

Also present:        Emily Guillory
                     Lisa Molinari (Via telephone.)

**0002**

PROCEEDINGS

Wednesday - November 10, 2021                              12:02 p.m.

P R O C E E D I N G S

---o0o---

THE CLERK:  Calling Criminal 19-0681, U.S.A. versus Shane Cratty.

THE COURT:  So where are we, Ms. Scott?

THE CLERK:  Shane Cratty.

THE COURT:  All right.  Call the case.

THE CLERK:  Counsel, please state your appearances in Criminal Action CR 19-0681, U.S.A. versus Shane Cratty.

MR. RIEBLI:  Good morning, Your Honor.  Frank Riebli and Sailaja Paidipaty for the United States.

THE COURT:  Good morning.

MR. GUY-SMITH:  Good morning, Your Honor.  Gregor Guy-Smith appearing on behalf of and with Shane Cratty.

THE COURT:  Good morning.

MR. RIEBLI:  And, Your Honor, before we begin, I wonder if I might ask if we could have Ms. Williams come into the courtroom at the same time.  Two victims would like to address the Court, and I would like to have them only do it once, because I think it would be especially --

THE COURT:  Yes, of course.

MR. RIEBLI:  Okay.  And then how the Court wants to proceed from there --

THE COURT:  Well, I want to -- before I do that, I

PROCEEDINGS

want to clarify a couple of things.

First of all, have you had an opportunity to review the presentence report with your client?

**MR. GUY-SMITH:**  Yes, I have.

**THE COURT:**  And that finds that the offense level is 35, criminal history category is 6, the guideline provision is 240 months.

This is a C plea?

**MR. GUY-SMITH:**  Yes.

**THE COURT:**  And the C plea provides a sentencing range, and the sentencing range is 84 to 96 months; is that correct?

**MR. RIEBLI:**  That's correct, Your Honor.

**MR. GUY-SMITH:**  Yes, Your Honor.

**THE COURT:**  Okay.  All right.  So if somebody wishes to come in and address the Court -- in this case, as well as Lindsay Muniz -- that's fine.

But the defendant is not here, right, for Lindsay Muniz?

**MR. RIEBLI:**  She should be.

**THE CLERK:**  She's upstairs.

**THE COURT:**  Well, I don't know that I -- that presents a problem.  If I'm going to take somebody's statement and apply it to both sentencings, both defendants have to be present.  I don't know of any other way to do it.

**MR. RIEBLI:**  I think that's right.  That's why we

PROCEEDINGS

would ask that both defendants be present, at least for the portion where the victim --

THE COURT:  Okay.  Well, they both can be here.

MR. GUY-SMITH:  We certainly have no objection to that, Your Honor.

THE COURT:  No.

MR. RIEBLI:  Okay.  Thank you.

THE CLERK:  So will it take you a few minutes --

THE MARSHAL:  It will because we only have one cell here --

THE COURT:  I mean, I can't -- somebody wants to only speak once, and that's certainly understandable under these circumstances.  I've got to have both people here.

THE CLERK:  Right.  So we'll need to take recess for the Marshals to do that.

THE COURT:  Sure.

MR. RIEBLI:  Thank you, Your Honor.

                    (Recess taken at 11:47 a.m.)

                 (Proceedings resumed at 12:02 p.m.)

THE COURT:  Okay.  Let the record reflect that parties are present.

    Why don't you call the other case as well.

THE CLERK:  Calling Criminal Action CR 19-0681, U.S.A. versus Lindsay Bain Muniz.

    Counsel, please state your appearances for the record.

PROCEEDINGS

MR. RIEBLI:  Good morning, Your Honor.  Frank Riebli and Sailaja Paidipaty for the United States.

MS. MOEEL:  Good afternoon, Your Honor.  Shaffy Moeel for Ms. Bain Muniz.  She is present before the Court in custody.

THE CLERK:  You may be seated.

THE COURT:  So even though we are proceeding separately with respect to the sentences, obviously, the Government has requested that the people who are going to speak in this matter, the victims, that they only have to speak once, which, of course, is entirely appropriate.

And so I wanted both defendants to be present, though I will take Mr. Cratty's sentence first, and then sentence Ms. Muniz.

So with that, we can proceed.

MR. RIEBLI:  Thank you, Your Honor.  And thank you for accommodating the request to have both defendants present.

THE COURT:  Sure.

MR. RIEBLI:  So we have two victims who would like to address the Court.  The first is Lisa Molinari, who is the mother and grandmother of the two victims.  She is present by telephone and she has a statement that she would like to read to the Court.

THE COURT:  Okay.

MR. RIEBLI:  So perhaps we can proceed with her first.

PROCEEDINGS

**THE COURT:** Yes, we can.

**MS. MOLINARI:** Thank you for your time, and for the opportunity for me to express my emotions surrounding these tragic incidents, and how they have impacted my life, as well as my family's lives.

I wrote this statement on Patrick's two-year anniversary. It was -- I chose to write this statement on his anniversary in order to honor him, and in hopes that the Court and the justice system will make an example of the defendants involved in this case.

It has taken me months to construct this statement as the depths of the pain that I carry daily is not something that I can easily -- that can easily be placed on paper.

I would like to shine a quick light on my son's character for the Court.  Patrick was the most loyal person I knew. Patrick was kind, loving, and he would give the shirt off of his back for a friend, or even a stranger, in a heartbeat.

I was 18 years old when I had Patrick.  Friends come and go.  My son stayed by my side and he was one of the best friends that I ever had.

Patrick was -- Patrick was also struggling, recovering addict.  In a moment of struggle, Patrick called the wrong people.  A simple phone call to the right person could have saved his and Liam's life, but instead he called one of three defendants.

Patrick had over 120 days of sobriety when he passed. Patrick was working diligently to create a positive life for himself, Liam, and his fiancee, Emily.  Patrick loved his life. Patrick was so focused on doing what was best for his family, and that is what he loved to do.

My son was labeled as a baby killer, and the press stated that Patrick murdered Liam and then committed suicide.  While my son laid unconscious, he was arrested.  When I walked into ICU, my son was unconscious and handcuffed to a hospital bed.

I feel that the people involved should be held accountable for their actions, and used as an example so that other people learn from their mistakes.

I am a recovering addict.  I have over 34 years of sobriety under my belt, which I am extremely proud of.  It took a lot of work and discipline, but more so accountability for my actions to get to this point.  I understand addiction and recovery as well as accountability, and truly being sorry for your actions.

Sadly, the only defendant -- the only defendant that has shown accountability has been Zamora.  She was the first to plead guilty and acknowledge her actions in Liam and Patrick's death.

Patrick has paid for his choice.  We, his family, will pay for his choice until the day we die.  My family and I will live in an emotional prison for the remainder of our lives.  This

PROCEEDINGS

tragedy will always be there.

Before I open my eyes in the morning it is there, and when I lay my head down at night it is there.  We will never escape this prison.  This makes me question why any of these defendants should be allowed freedom.

And innocent baby was poisoned.  As Liam's grandmother, I feel that it is my duty to ensure that no child suffers the same death as Liam did.

But I could not save my son or my grandson, but the Court can make an example of these three defendants so that other struggling addicts do not make these same choices.

At this time, I would like to address the defendants individually.

Grief is like a backpack filled with rocks.  Some days, the weight is way too much and you can't take the backpack off; you just have to keep living your life with it on.  My backpack is very heavy, but I will walk through life knowing that your backpacks are much heavier.  Whether you acknowledge this is your decision.

I know I must forgive in order for me to heal properly. My son was an addict and I understand that, as addicts, we do not make the best decisions.  Patrick chose to call the wrong people.  Patrick paid for having the wrong friends.  And it was your choices that could have saved Patrick and Liam's lives, but your actions resulted in their deaths.

Shane, I would like to remind you of your words from your KRON interview on September 16th, 2019.  The same day I had to decide whether I should remove my son off of life support.  I learned that day that if Patrick was to survive, he would live without any of his limbs.

This moment in your interview are embedded in my family and I's hearts, minds, and souls.  Specifically you said the character -- the -- characterized yourself as a good friend of Patrick's and stated -- I broke down, I couldn't help it.  I just started crying.  It made me sick physically.  I started throwing up -- "I am almost positive Patrick had been clean for a number of months at this point, and I think it was probably the first time he had used the drug.  And, you know, it could have fallen out of his pocket or, like, I really don't know.  I have been trying to figure it out for the last two days."

The news reporter wrote that you stated Patrick loved his son Liam, and he would never purposely harm him.

As to Liam, you told reporters he was a happy little boy. He loved his dad.

You went on the news and you lied to the world.  You were the farthest from Patrick's friend.  The fact that you went to the media for attention surrounding my grandson's death is unfathomable.  You played a major role in getting my son poison, and you have no guilt for going to the press.

You claimed to be shocked that Patrick had relapsed.  You

were even at the hospital when Patrick died.  The actions shown to me that you have no remorse more for Patrick or Liam's death.

Actions speak loudly, and yours have destroyed my entire family's lives; therefore, I ask the Court to give you the maximum sentence in hopes that it will show you the consequences of supplying illegal substances that may kill individuals.  I hope that they give you the maximum sentence so others can look at your actions and make better decisions when it comes to the people they surround themselves with.

I ask that the Court please protect the community so that this man does not kill another person's son or grandchild.

Lindsay, the last time I was given the opportunity to speak to the Court was on the first year anniversary of Patrick's passing, which was just two days after the anniversary of Liam's death.

You were requesting to be released so you could say goodbye to your stepfather.  You were provided something that my family was never given, the opportunity to say goodbye to Patrick and Liam.

The Court was very generous by offering your release, and during that time, you chose to go onto social media and joke about Patrick and Liam's death.  Specifically you wrote:  To all my haters, thank you for making me a celeb.

The fact that you are proud and think you're a celebrity

for killing my grandson and my son is extremely disturbing.

You have shown the world and my family another example of your lack of remorse and your lack of accountability for your actions.  Your behavior while on release is a result of the Court providing you with leniency and you continuing to take advantage of the system.

You claimed to be my son's friend, but in turn you helped kill him and his innocent son.  You are a mother yourself; however, you have no remorse for your actions which took Emily's child away from our family.

My family has faced the most horrific tragedy that anyone could ever endeavor, knowing that someone responsible for the acts that led to Liam and Patrick's death, and that -- and they lack remorse in regard to their actions will once again be released into society is something I will pray will never occur.

In your last court appearance you stated you felt the rehabilitation the Court was recommending was too strict and that you did not want any charges to, quote/unquote, follow you in life.  My personal thought is that you are exactly where you should be, in a facility that is offering you rehabilitation and the guarantee of safety for the community -- for the community.

Incarceration and separation from the community seems to be the appropriate place for you.  You have a history of

violating the law.  In fact, you had just been released from jail on bail right before giving Patrick the dose that killed him and Liam.

My understanding is that when you are in custody, you are in a place where access to drugs is not an option, unlike the streets of society.

Your disregard for the Court and lack of concern for the safety of our community is disturbing.  And I fear for people's -- other people's families when I think of you being released.

My family has been living in a nightmare, residing in hell for the past two years as a result of your actions which have caused Patrick and Liam's death.  It is still my belief that you -- had you not been released, Patrick and Liam would still be alive today.

I am asking the Court to send a message to society so that others understand that providing individuals with illegal, lethal substances have consequences.

Our lives will never be the same.  Although we cannot bring Liam and Patrick back, the Court can help our family and the community by providing Ms. Muniz and Mr. Cratty with the maximum penalty for their actions.

I fear that if and when they are released from custody, our community will not be safe.  We have waited patiently for the individuals to be held accountable for their roles in

PROCEEDINGS

Patrick and Liam's death.  I hope that the Court continues to protect other families from experiencing the excruciating pain that we are living through.

Thank you very much for your time.

THE COURT:  Thank you.

MR. RIEBLI:  Thank you, Your Honor.

I believe the second person to address the Court is Emily Guillory.  She is the girlfriend of the father victim, and the mother of the child victim.

MS. GUILLORY:  Hi, Your Honor.  My name is Emily Guillory.  My last name is spelled G-u-i-l-l-o-r-y.  And I came today to make my statement of how this case has affected my life.

I don't think that there was any way possible for me to sit and write down in a letter how this has affected my life, in any way, shape, or form.

I just want to start by saying, like, I am a recovering addict as well.  You know, I went through a lot of my life struggling with mental illness and addiction; had a family who was, you know, in active addiction for parts of that as well.

And I have worked effortlessly [sic] over the last two years to get to where I am today.  You know, even losing my whole family.  I feel like it comes to a certain point in your life, like Lisa had stated, that you need to accept what happens in life for what it is, and accept that you need to

PROCEEDINGS

take accountability and, you know, take the consequences that come with your actions.

There is a lot of mistakes that I've made in my past, just as all addicts do.  And I feel as if, no matter where you are in life, whether it be incarcerated or out in the streets, or in active addiction, losing your whole family, if you want to get clean, and you want to change your life, and you want to be happy, and you want to be healthy and eventually, maybe, see your children again -- because you have that opportunity and some people don't -- that you can get clean being incarcerated.

If you want to make that choice, you are the only person that can make that change in your life.  And it doesn't matter where you are.

Every child deserves to have a mother and a father who is present in their life.  And you still, you know, like, even taking accountability for these actions and, like, I understand you don't want things to -- sorry speaking to Lindsay.  I understand you don't want choices made in your past to follow you; but does anybody?

I know sure -- I know for sure that I don't want to have to live the rest of my life being the person that everybody knows infant son and boyfriend died of a Fentanyl overdose while I was working; that I had to go walk into that room and find my son laying face down on the floor, dead, knowing that there was nothing that I could do to save him.

**0015**

PROCEEDINGS

And I don't get that choice to hope, wishful thinking that that won't follow me for the rest of my life, because every time I close my eyes, I can see my son's face when I flipped him over.  Every time I close my eyes, I can see Patrick laying in the hospital handcuffed to the bed, knowing that he couldn't comprehend what I was saying.

Granted, again, I understand being an addict.  I understand that he was the one who called Shane.  He was the one who reached out.  I get that.

But also being an addict in active addiction, when things happen, we all know that you're not thinking about consequences of what's going to happen after, if you put these substances into your body.

But both of you claiming to have been friends with Patrick for years, you should have taken that opportunity to be a friend, and not make some quick money.

You knew that he was alone with his son that night, Shane.  You were with both of them when he left our son, and you got him the drugs to intoxicate himself with.  You knew he was alone with a 13-month-old child that had no say in the matter.  He was an innocent child that was caught in the crossfire.

And you know from your report in the news that he was clean, and he was finally trying to do the right thing.  And he had a really hard past.  And that was not something that Patrick had been known to try and, like -- he had tried to get

PROCEEDINGS

clean before, but this was the one time where he had a family; he had things to look forward to; he had his whole life ahead of him; he was 29 years old.  And you took that from me.

I have to live every single day knowing that I don't get to watch my son go to his first day of kindergarten.  I don't get any of those opportunities that these people get, starting families and having a new life; and getting clean and being able to have all of these amazing things happen.

You know, like, I sit and I sit for months and months and months after this happened, where I couldn't even get out of bed because I didn't want to be here anymore.  I wanted to be with my son.

But instead of acting on that, I chose to work so hard to be clean and to be -- to where I am today, and to make a difference in the community in any single way that I could; working with non-profits for harm reduction; and helping other people who are struggling and in active addiction get clean, and find a way to be happy and to be healthy and to be a part of their children's lives again when their addiction has came so far that that's the last thing that they want is to be around their children and their family.

And I still work every single day to get people into treatment because I have finally found a way to accept life is messed up.  You know, things happen and -- that are completely out of our control.

0017

And there is nothing that I can ever say or do to bring them back. But I can try and live every single day showing them that I can be strong and that I can stay clean.

And that I can help other people who are struggling, that deserve to have that, and that deserve and want to -- like, no one can force you to be clean, you know. You can get court ordered and get let out, in different treatment programs and stuff like that. But unless the individual who is struggling wants to be clean, and is willing to do the work to be clean and stay clean, you're not going to stay clean.

And the first step in recovery is honesty and accepting the mistakes that you have made in the past, and taking it for what it is, and apologizing and making amends.

And that is not me stating that I'm looking for an apology from either one of you because I would never want to ask for something that isn't -- that doesn't mean something.

You know, it means a lot to me to be able to sit here and state my emotions in court today. But for me to ask for an apology, or expect that from somebody when I don't think they are ready, isn't going to do me any good in healing.

I just truly, truly hope that you are both able to accept that this tragedy that our family has to live every single day for the rest of our lives with, you get to do your time. And I truly hope that you take this for what it is and you get help; you get the help that you need.

PROCEEDINGS

Because, to be completely honest, like, in our society, just in 2020, in the United States, over 70,000 people died of synthetic opioid overdoses.  And both of you, you're helping that.  You're helping hand out these drugs that are instantly killing people.  And you have that choice, you have that opportunity to say no, to get help and be clean.

And I know that this happens all the time.  Like, every other day in Sonoma County, there is overdoses and deaths.  And it's part of being an addict, I understand that.  But you, as an individual, have a choice to get help for you and to say no.

Like, where does this cycle stop?

And I know both of you have had countless amount of chances after being incarcerated to get help.  And, you know, I understand, again, that, like, it's not something that just happens unless you want it.

Don't you want to have a relationship with your children someday?  I'm sure that's something you've thought about.  I don't think get that opportunity anymore because my son is dead.  He is never coming back.

I just truly hope that you guys are able to accept what the Court has to say.  And I truly ask that, like Lisa stated, that there is hope that this whole situation, this whole event, this whole tragic incident -- incident is able to teach our community something.  You know, this isn't just about me.  This isn't just about Lisa.  This isn't just about Patrick or Liam.

It's about our community as a whole and how many people are dying every single day from these drugs that you are willingly handing out.

Please get help.

Whether you're incarcerated or not, there is -- there is chances for recovery inside of treatment.  And I really, truly hope that with this case the Court is able to make an example out of it and show people that this isn't how we have to live our lives.  You don't have to use again.  You don't have to make any of these choices and keep being incarcerated and locked up, and people dying left and right.  Take it for what it is, and just learn something from it.

Thank you.

THE COURT:  Thank you.

Does the Government want to proceed?

MR. RIEBLI:  Yes, Your Honor.

THE COURT:  Let's proceed with Mr. Cratty first.

MR. RIEBLI:  Thank you.

You know, what the victims have had to say is more powerful than what I can tell the Court.  And certainly what I don't want to do is diminish their statements by layering legal argument on top of them.

What I will say is that, as we said in our briefs, we're not intending, in the resolution we have proposed to the Court, either to value the victims' lives or to, in some measure, make

PROCEEDINGS

up for their loss; it's not possible.

The reason we have reached this resolution is we believe that it is an important way for the defendants to -- to take responsibility for their roles in the victims' deaths in a way that I hope will help the victims heal.

The Court heard Ms. Molinari ask that the Court sentence the defendants to the maximum sentence allowed.  We've offered -- what we proposed to the Court is less than that, and we've proposed that resolution for the reasons we described in our sentencing memorandum.

I think that the defendants admitting their role in the deaths is important.  I think it's important for the victims. And I think it's important for the defendants themselves.  That they have signed a document saying that they helped to cause these deaths is the first step towards their accepting responsibility for what they did and, hopefully, never doing it again.

I'm happy to address any questions the Court has regarding the sentencing range or the Government's recommendation as to the range.  I think, the Court has the parties' memoranda, so I won't take that up now, unless the Court has specific questions.

THE COURT:  No.  Thank you.

Mr. Gregor Guy-Smith, did you wish to address the Court?

MR. GUY-SMITH:  Shane Cratty takes full responsibility

for his involvement in the matters that bring him before you.

You had an opportunity to know his history and what he has gone through.  I believe the agreement that we've fashioned, is reasonable under the circumstances, understanding the gravity that we are dealing with.

And I would submit it on that basis, except that Mr. Cratty would like to say something to the Court.

**THE COURT:**  Mr. Cratty.

**DEFENDANT CRATTY:**  I am so sorry.  Words cannot begin to express the amount of sorrow and regret I feel for being involved in this tragedy.  I cannot even fathom the pain I have caused to Pat and Liam's family by helping to get the drugs that took their lives.

There is nothing I wouldn't give to go back to that day and do everything in my power to prevent them from getting that Fentanyl.  If it was possible, I would gladly give my life for theirs to be spared.  I wish I could feel the pain of their families so they wouldn't have to.  Unfortunately, none of these things are possible.

I have to live my life knowing my actions helped to cause the death of someone I considered a friend, as well an innocent child.  Although this is nothing compared to the pain the family must feel, it does hurt me that they are gone and I was a reason for that.

I fully understand the need for consequences and

punishment in this case, and accept the sentence that you will impose.

Thank you.

THE COURT: Thank you.

Okay. Before proceeding with your sentence, I think maybe it makes sense for me to hear from counsel for Ms. Muniz.

Do you have anything that you wish to add, the Government, with respect to Ms. Muniz?

MR. RIEBLI: Your Honor, the only thing I would say is, I think -- we said this in our brief, but I believe that Ms. Muniz and Mr. Cratty are equally culpable in this case.

THE COURT: I'm sorry?

MR. RIEBLI: I'm sorry.

I believe that all three defendants in this case are equally culpable. So I believe Ms. Cratty -- sorry, Ms. Muniz and Mr. Cratty, in the Government's estimation, should be sentenced equally.

And I will -- honestly, I'll credit defense counsel for helping us see the evidence and the defendants' relative culpability in a different way from how we initially saw it.

It was after extensive conversations, negotiations, and I think some good points that they made to us -- and it's not just the two sitting here, but Ms. Leonida, who is here as well.

We have come to see them as equally culpable, each for

slightly different reasons that we set forth.  So other than that, I think the things I would say as to Ms. Muniz are the same I would say as to Mr. Cratty.

We would just ask that the Court consider them the same when imposing sentence.

**THE COURT:**  Thank you.

Are you counsel for Ms. Muniz?

**MS. MOEEL:**  Thank you, Your Honor.

Your Honor, in my conversations with Government counsel, we've discussed at length how painful this entire case has been from the very beginning, and that it's painful for all parties.

And I wanted to note that the defense is really struck by the grace in Emily's words here today, and the deep well of empathy that I think she has shown in her plea to both Lindsay and Shane to get well.

Lindsay does not intend to make light of that plea.  In the last two years in custody, she has remained sober, and intends to remain sober.

And, as Your Honor well knows, there is opportunity in the Santa Rita Jail to use opioids, including Fentanyl.  And Ms. Muniz has been sober while under the care of the medical department there, and has been taking Suboxone in order to help on her road to sobriety.  And does feel -- and is being drug tested, as she is telling me now.  And she does feel, truly, a difference in perspective from this long period of sobriety

that she has had in these last two years.

And she will tell you yourself -- herself, Your Honor, the deep levels of remorse that she felt, from the very beginning when she was first arrested, days after this tragedy happened, all throughout this case.

I'm not going to repeat what I have already said in my sentencing memorandum regarding her personal history and what brought her to use in the first place; what brought her to relapse; and what brought her, ultimately, to the conduct alleged in this case.

But I will say that Lindsay has experienced so many levels of trauma that, in fact, I think, the two years -- that highlight her two years of sobriety.  And that she is on this mind-set to be well, given this tragedy that she has been a part of; that that does speak to her character and her ability to do well, as the victims in this case are urging her to do so that their loss is not in vain.

She is remorseful.  And I can, if the Court wants, address some of the issues regarding culpability; but I do reiterate my request that she receive the low end of the range that we've worked out, and that we think that that does meet all the goals of sentencing.  And that it's fair.  It's a significant custodial sentence here.  It's the longest she has ever done and it will not be in vain.

THE COURT:  Ms. Muniz?

PROCEEDINGS

**THE CLERK:** Please give her the mic. Thank you.

**DEFENDANT MUNIZ:** I want to say to the family that -- can I face this way -- that I'm so sorry for your loss and my part in this crime. This should never have happened and I'll regret it for the rest of my life.

You're -- I feel like I should skip part of this. It's so long. I didn't know Shane was going to write such a short one.

Okay.

Should I read all of it?

Okay. I'm going to skip that part then.

So I've only -- so since 30, I've only had two relapses. I only used for three and a half years in my life, since I lost my children at 26. I lost them because my husband went to prison, and I thought I'd never see him again.

I relapsed this last time because my father got cancer, and he just died last month.

And since I've been incarcerated. My youngest brother has died and my husband has died, and may father has died.

And I haven't been -- I wasn't released for any of their funerals. So I did get to say goodbye to my father last year.

And the thing that I said, Emily, I said that I was confused. I was thinking about going to trial because of evidence of these witnesses, so I thought I was innocent. And so -- but I've come -- I've taken this -- I'm taking responsibility for this.

I -- so much stuff about me in here that I'm not going to say because it's just a lot of random -- a lot of history about my -- about myself that is just not relevant right now.

I really wish I wrote this better.

I have gotten to see my -- have had -- developed a relationship with my daughter again.  We got really close, since I lost my daughter at 26.  I got to see her again once I was in rehab.  In 2019, I graduated Athena House, my first rehab.  Graduated my first time.

And my daughter came to see me my first month I was there.  And we became really close that whole year, and after I graduated.  And she was with me every weekend.  And -- but ever since this arrest, she got -- she was really mad at me.

And -- but recently these last four months or three months, we've been able to develop our relationship again.  She said that she is going to come see me.

And my aunt is taking care of her.  She is really proud that I've been clean and sober.

I'm doing the Suboxone tests and everything, because I have never been clean this long since I started at 26.  I'm 34 now.

And I'm -- I will probably never see my boys again because they're adopted out.  But my aunt has my daughter, and so I'll be able to visit with her and develop a relationship with her.

And if -- if it had just been some little relapse, I

PROCEEDINGS

probably would have lost her forever.  But this case didn't happen -- maybe it was just a good thing, you know?  Because I would have -- this case really scared the hell out of me.  And I'll never return to drugs.  I value my life and I don't want to see my daughter disappointed in me ever again.  And she means too much to me.

And your loss is so close to my loss of losing my boys, never seeing them since they were two.  I'll never see them again.  I didn't get to see any of my children go to kindergarten.

I won't see my daughter's 13th birthday or any of them -- I haven't seen any of her birthdays since she was four years old.

So I know they are not dead, and I can see again, my boys, as an adult or something.  But you just -- I'm not -- I really can relate to your loss, Emily, and I'm just so a sorry for you.

I have it -- and I wrote in here for you.  I'm trying to find that part.  I remember it.

It's -- I wrote that -- that you are just an inspiration to me, that -- because when I lost my children, I wasn't as strong as you.  That's when I started using drugs and I fell apart.  It was the first time in my life I used hard drugs, at 26.

And you're just an inspiration to me, that you could have

your son die and that makes you stronger.  And every time, I think about falling apart, I think about you.  Any time I feel -- like, when my father died and my husband died, I thought about you, and I didn't feel like using drugs at all.  And it just made me stronger.  And every time I feel like I'm going to struggle, I think, about how strong you were.

And I heard the 911 call and just thinking about how you could stay sober after that.  That means anybody can be sober.

And I'm never going to be weak again, because I'll always hold myself up next to you as a standard, you know.  And I'll never let myself fall below that standard because, you know, I owe that to Liam and to Pat.  And I owe that to you and to the whole family.

And I'm so, so sorry for your loss.

And that's all I have to say.

And you can check up on me any time when I get out.  And I'll -- you can, you know -- and Lisa Molinari wrote in the probation report that she wants to, you know, talk to me about her anger.  You guys are all welcome to keep in touch with me and check in with me and see how my progress is going, ask my family how my progress is going.  So -- okay?

And I really hope that for you, and I hope you can find happiness again.

THE COURT:  Okay.

Well, let me address the sentencing in the case in the

PROCEEDINGS

following way:  I would like to speak generally about this tragedy, and speak specifically about it.

The tragedy of Fentanyl is -- and the opioid crisis cannot be overstated.  It causes enormous grief and suffering to anyone who comes into contact with it; not just people who use it or furnish it, but to anyone who has any type of relationship with the people who are using it.

In my experience, I have never seen a drug this bad; this potent; this -- a drug that is more dangerous than Fentanyl; in very small quantities can cause death; and death and use causes suffering.

And there is -- you know, this is the classic case.  This is the case that's been repeated thousands and thousands and thousands of times across the country.

And it seems that we're all late coming to this realization.  We are all scrambling around trying to figure out how to respond to it.

And I think there are no good answers, first of all. There is really nothing that this Court can do -- and it feels quite powerless -- to address the suffering of Ms. Molinari and the mother of the child, and all other people who cared about these people.

There is nothing that I can do or that anyone can do, that I can see, that will make people feel whole again and optimistic about their lives and go on.  This is a tragedy as

described; it's a knapsack filled with rocks.  And it will remain with all of you for your entire life, entire life, never go away; it will always be there.  And if there was something that I could do or the Government could do or somebody could do to make that knapsack lighter, believe me, we would -- we would, but there isn't.

Though the parties have suggested that maybe this case can send a signal to all people, how dangerous the drugs are and how we will not tolerate their use, their furnishing, their distribution, and that if someone is involved in this trade, for whatever reason -- for whatever reason, they will essentially forfeit their lives and spend the rest of their lives in prison.

And, indeed, the Government was faced with that -- with that issue.  And the way they approached it is an approach which I think is correct, and I think it took courage on their part; and it's why the Court is accepting the C plea.  While the C plea has a range, the range of sentencing is well below that of the sentencing guidelines.

And the way the Government approached it was to take a look outside the guidelines and take a look:  What is the sentence?  What are the sentences that are imposed in the state court system, essentially, for the tragedy of a manslaughter, a killing as a result of drug use?

And they came up with this range.  And I think the range

PROCEEDINGS

is appropriate.

And the Court notes, of course, that if the Court were to choose to not accept it, the likelihood is that there would be a trial, and the victims, and I say the members of the family, the loved ones, would have to go through a trial.

Would that -- would that heal?  Would that make life any easier?  Not in my judgment.

I have seen a lot of trials.  And I think, in a sense, everybody loses in a trial.  You have to relive the horror of this experience.  You have to think about a young man being chained to a bed while he dies.  You have to think about an innocent child being inadvertently subjected to this.  How that would heal, I don't know.

It makes me sad just to think about it.  Because we have children, we have grandchildren.  We know the joy that children and grandchildren in our lives can bring to us, and now you're -- you have been denied that.  And I'm so very, very sorry.

Sentencing is, of course, individualized.  It has to -- it has to take into account all of those factors that the guidelines provide.  I have to tell you that -- and it's probably more a result of being on the Sentencing Commission than having -- I have a bellwether opioid case, so I'm familiar with opioids.

But it probably -- my education in this has come about, I

think, as a result of being on the Sentencing Commission for more than 12 years, and we were told Fentanyl is different. It's just different.  And it's different because it can easily cause death and it can cause it in the smallest quantities and that's a different kind of drug.

Have we responded to it appropriately?  I don't know.  But I sure know it's different.

And when I see defendants come before me, who have, in some manner, contributed to the supply and distribution of this drug, I'm certainly aware of it.  I'm certainly aware of it.

And, you know, if I could go out and give speeches, or go out and take newspapers ads, or go through the Tenderloin and grab all the Fentanyl that exists out there, I would, if I could do it.  I mean, I can't do it, but I would -- because it's -- just is so horrible, so dangerous.

So does a sentence send a message?  In part it does, but in part it doesn't.

The experience with drugs over the years has been that long sentences have not necessarily worked.  They haven't worked.  They have not necessarily resulted in a decrease in drug use or distribution.  And it hasn't been shown that the longer sentence a person serves, the less likely that person is to recidivate after a certain point.  It just hasn't shown that.

And I'm very aware of the statistics, because that's what

the Sentencing Commission does.  It gathers statistics, and it looks at the evidence behind what is done.

So I know that the family, I know -- I understand that the family is crying out for some justice in this situation.  But the justice you really want can't be achieved.  It just can't.  There is nothing that can bring back your children -- in both cases -- your children to you.  And that is just unobtainable.

I do think that the defendants understand the scope of what they've done.  I don't know that they can feel the pain that you have suffered because that pain is unimaginable, but I think they understand it.  And I think that they understand that it will follow them all the rest of their lives.

What can they do about it?  It's up to them.  They have to come to terms with themselves, as you've said.

Addiction is highly individualized.  It starts individually with a recognition of what it does, what it has done, and an honesty in admitting where they are on it.

And I hope it's started with them.  They've been in custody for several years now.  I hope that they recognize it.  And, of course, I hope that they do something about it.

But, I wanted to explain that the Court will accept the C plea in both cases of the defendants because I think it achieves not only some degree of individualized justice, it also brings some closure to the victims, to the parents and the loved ones of these people, which is so important, so very,

PROCEEDINGS

very important.

Life is for the living; you know that old cliche.  And it's sad, but true, because you must move forward.

I think that the courage of the mother, under these circumstances, is remarkable.  I don't think I have ever seen it; with a child that dies under these circumstances, and with the mother's own addiction which she has surmounted is really remarkable.

I think the process has started for you.  The healing process.

I hope it does for Ms. Molinari.  I'm a grandparent.  I know what it must be like to -- to look forward to a grandchild and the joy that that can give, and now that's been denied.

So I don't know whether -- I don't know how closure really works.  I don't know whether it's acceptance; whether it's a sense that, well, I must move on.  It's very, very complicated.  And it's very individualized.

But, again, this is a failure of courts to be able to successfully address these problems.  It's a failure of society to figure out how to address these problems.  But it can't be swept under the rug.  It can't be ignored, and it can't be accepted.  It isn't business as usual.  It has to be addressed.  And I think this case, for all of its tragedies, does take a step forward in addressing the problem.

So I will, first, start with Mr. Cratty.

PROCEEDINGS

Again, I must point out, perhaps the obvious, that he was addicted to opioids.  He did not successfully receive treatment.  He had some treatment, but it wasn't successful.  At the time of the instant offense, he was spending, himself, $500 a week on heroin.

Pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that Shane Cratty is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 96 months.

As to Ms. Muniz, I point out this following paragraph in the presentence report.  (Reading):

"It is apparent that the defendant suffered trauma as a child.  She was sexually abused by a foster parent for nine months, and she regularly witnessed domestic violence with her parents.  The trauma continued into adulthood, where the defendant married a man both she and her mother reported was physically violent and who was later arrested and charged with murder.

"Ms. Williams admittedly had a drinking problem, and later lost custody of her three young children after a series of events that began with her driving under the influence of alcohol while the children were with her.  Once she lost legal custody, she began using drugs.  And other than brief periods of

PROCEEDINGS

sobriety, she used drugs until the instant offense."

Well, that story -- both those stories, they are so common, they are so universal in the unfolding of these tales that we must realize that something must be done in these situations.

Sentencing is highly individualized, as I pointed out. And it is the sentence of this Court that pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Lindsay Williams Muniz is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 90 months.

With respect to both defendants, the sentence -- the terms are the same and are as follows:  The Court recommends that both defendants participate in the Bureau of Prisons' Residential Drug Abuse Treatment Program.

Upon release from imprisonment, both defendants shall be placed on supervised release for a term of four years.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendants shall report in person to the probation office in the district to which the defendants are released.

While on supervised release, the defendants shall not commit another federal, state, or local crime; shall comply with the standard conditions that have been adopted by this court; shall comply with the mandatory DNA collection; and shall refrain from any unlawful use of a controlled substance

and submit to a drug test with in 15 days of release on supervised release, and two periodic drug tests thereafter; and shall comply with the following conditions:  Both defendants must pay any special assessment that is imposed by this judgment that remains unpaid at the commencement of the term of supervised release.

Both defendants must undergo an assessment of mental health -- for mental health treatment services.  If services are deemed appropriate, then the defendants shall pay part or all of the costs of the treatment as directed by the probation officer.

Neither defendant shall have any contact with any co-defendant in this case.

Both defendants shall submit their person, residence, office, vehicle, electronic devices and their data, including cell phones, computers and electronic storage media, or any property under their control to a search.  Such a search must be conducted by a U.S. probation officer or any federal, state, or local law enforcement officer at any time, with or without suspicion.  Failure to submit to such a search may be grounds for revocation.  The defendant shall warn any residents that the premises may be subject to searches.

The defendants shall participate in a program of testing and treatment for drug abuse, as directed by the probation officer, until such time as they are released from treatment by

PROCEEDINGS

the probation officer.

It is further ordered that each defendant shall pay to the United States a special assessment of $100.  Payment shall be made to the Clerk of the U.S. District Court, 450 Golden Gate Avenue, Box 36060, San Francisco, California 94102.  And during imprisonment, payment of criminal monetary penalties are due at a rate of not less than $25 per quarter.  Payments should be made through the Bureau of Prisons' Inmate Financial Responsibility Program.

The Court finds that neither defendant has the ability to pay a fine and no fine is ordered.

Anything further?

MR. RIEBLI:  Yes, Your Honor.  Three things.

First, the Court may have said this and, if so, and I missed it, I apologize.

THE COURT:  I may have missed it.

MR. RIEBLI:  I wanted to confirm that the Court was adopting the total offense level of 35, and then the respective criminal history scores of 5 and 6 for Ms. Muniz and Mr. Cratty, respectively, as set forth in the PSR.

THE COURT:  Mr. Cratty has a criminal history category of 6, and his co-defendant has a criminal history category of 5.

MR. RIEBLI:  Okay.  Thank you.

And then the second was -- and this has come up recently,

**0039**

PROCEEDINGS

with regard to the expanded search clause, I wanted to state the basis for requesting that, and that is, in this case, that the defendants used cell phones to set up the --

THE COURT:  Did I not put in the cell phone?

MR. RIEBLI:  No, no, the Court did.  But there is some concern about adequately supporting the expanded search clause. And so from the Government's perspective it's because, in this case, cell phones were used to set up this transaction, and so we believe that an expanded search clause is appropriate.

THE COURT:  Right.

MR. RIEBLI:  And then last is, in light of the Court's sentence, the Government moves to dismiss Count Two as to both Mr. Cratty and Ms. Muniz -- or Ms. Williams.

THE COURT:  And that motion is granted.

MR. RIEBLI:  Thank you.

MS. MOEEL:  Thank you, Your Honor.

For Ms. Muniz, if Your Honor is inclined to, please, recommend to the Bureau of Prisons that she is housed at FCI Dublin or somewhere close --

THE COURT:  I'll make that recommendation, but I want it to be consistent with any treatment she is receiving.

MS. MOEEL:  Yes, Your Honor.  Thank you.

MR. GUY-SMITH:  And with regard to Mr. Cratty --

THE COURT:  I'm sorry?

MR. GUY-SMITH:  With regard to Mr. Cratty, we would

request that he be -- the Court make a recommendation that he be located somewhere in the state of California, if that is feasible.

THE COURT: Yeah.  If that's consistent with the treatment.

MR. GUY-SMITH: Understood.  Of course.

THE COURT: That will be the recommendation of the Court.

Okay.  Is there anything further?

MR. RIEBLI: No, Your Honor.  Thank you.

THE COURT: I want to thank everyone who participated in it.  Thank you very much.  We're in recess.

(Proceedings adjourned at 1:07 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Sunday, November 21, 2021

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court

# EXHIBIT B

FILED UNDER SEAL

# EXHIBIT C

## FILED UNDER SEAL

# EXHIBIT D

| BP-A0304 | **DISCIPLINE HEARING OFFICER REPORT** | IR#:  4127779 |
|---|---|---|
| | | Reg#: 43951-480 |
| | Dept. of Justice / Federal Bureau of Prisons | CRATTY, SHANE |

| Institution: **BUTNER MED II FCI** | Incident Report Number: **4127779** | |
|---|---|---|
| NAME OF INMATE: **CRATTY, SHANE** | REG.NO.: **43951-480** | UNIT: **2 GP** |
| Date of Incident Report: **06-03-2025** | Offense Code(s): **203 224A 307** | |
| Date of Incident: **06-03-2025** | | |

Summary of Charges:
. **203 – THREATENING BODILY HARM. 307 – REFUSING TO OBEY AN ORDER. 224 – ASSAULTING W/O SERIOUS INJURY (Attempting).**

I.   NOTICE OF CHARGE(S)

A.   Advanced written notice of charge (copy of Incident Report) was given to inmate on **06-04-2025** at **1430 hrs** (by staff member) **T. ALLEN**

B.   The DHO Hearing was held on **07-10-2025** at **0728 hrs**

C.   The inmate was advised of the rights before the DHO by (staff member):
     **Griffin** on **06-05-2025**

     and a copy of the advisement of rights form is attached.

D.   Delay in Process **None**

II.   STAFF REPRESENTATIVE

A.   Inmate waived right to staff representative:   [Yes] **X**   [No] _

B.   Inmate requested staff representative and                                          appeared.
     **NA**

C.   Staff Representative's Statement:
     **NA**

D.   Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that:
     **NA**

E.   Staff representative **NA**                                          was appointed.

III.   PRESENTATION OF EVIDENCE

A.   Inmate **neither admits nor denies** the charge(s).

B.   Summary of Inmate Statement:
     Inmate Cratty acknowledged that he had received a copy of the incident report and that he understood his rights before the DHO. Inmate Cratty I did not raise any issues or expressed any concerns with the discipline process to this point.

     Inmate Cratty neither confirmed or denied the charge, provided a statement "I told them I had a mental health crisis the day before. I smoked a tiny piece of deuce, and I could walk through the gate. I was bleeding from my head and went into the Lt's office and ran at Reynolds and he restrained me, and I started talking crazy." Inmate Cratty did not provide any documentary evidence for the DHO to consider, nor requested video footage be reviewed at any stage of the disciplinary process.

Prescribed by P5270                                          Replaces BP-304(52) of Jan 88

**0102**

| BP-A0304 | **DISCIPLINE HEARING OFFICER REPORT** | IR#: 4127779 |
|---|---|---|
| | | Reg#: 43951-480 |
| | Dept. of Justice / Federal Bureau of Prisons | CRATTY, SHANE |

C.    Witnesses

1.    The inmate waived right to witnesses.  [Yes] **X**    [No] __

2.    The following persons were called as witness at this hearing and appeared (Each witness name and statement listed below):

**NA**

3.    The following persons requested were not called for the reason(s) given (Each witness name and statement listed below):

**NA**

4.    Unavailable witnesses were requested to submit written statements and those statements received were considered (Each witness name and statement listed below):

**NA**

D.    Documentary Evidence. In addition to the Incident Report and Investigation, the DHO considered the following documents:

**Incident Report - Staff Injury Assessments -- (BOP-IRSIA)**
**Incident Report - Photographs -- (BOP-IRPHO)**
**Incident Report - Staff Memorandums -- (BOP-IRMEM)**
**Incident Report - Medical Assessments -- (BOP-IRMEDA)**
/    **Incident Report - Mental Health Evaluation -- (BOP-IRMHE)**

E.    Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

**NA**

IV.    FINDINGS OF THE DHO
    __ A. The act was committed as charged.    __ C. No prohibited act was committed:
    **X** B. The following act was committed:    Expunge according to inmate discipline PS.
    **224A**

V.    SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations written documents, etc.)

This hearing was conducted while inmate Cratty was on suicide watch at the request of institution psychology staff. The DHO first ensured the inmate received a copy of the incident report, understood his rights, was not requesting the assistance of a staff representative, did not wish to call any witnesses, had no documentary evidence to present and was not requesting video evidence be reviewed at any stage of the disciplinary process. It was noted on your Mental Health Evaluation you were found competent to participate in the disciplinary process and responsible for your actions at the time of the incident. You were provided Mental Health Evaluation for review prior to attempting to initiate the hearing.

The DHO finds you have committed the prohibited act Code 224: Assaulting without Serious Injury, while incarcerated at FCI 2 Butner, North Carolina. The specific evidence relied upon to make this finding was the reporting officer's written report, who reported

Prescribed by P5270                    Replaces BP-304(52) of Jan 88

2

0103



| BP-A0304 | **DISCIPLINE HEARING OFFICER REPORT** | IR#: 4127779 |
|---|---|---|
| | | Reg#: 43951-480 |
| Dept. of Justice / Federal Bureau of Prisons | | CRATTY, SHANE |

the following:

On June 3,2025 at approximately 1500 I observed inmate Cratty, Shane #43951-480 running across the compound. I gave the inmate a direct order to cease his actions in which he refused. Inmate Cratty ran to the compound security slow down gate, physically making contact. Inmate Cratty then entered the Lieutenant's office and approached staff yelling and throwing his hands in the air. Staff gave inmate Cratty a direct order to cease his actions and submit to hand restraints in which he refused. Inmate Cratty then then escalated his disruptive behavior by running toward me and attempting to kick and hit staff with closed fist. Inmate Cratty was then placed on the ground to regain control of the situation. As I attempted to apply leg restrains inmate Cratty continued his disruptive behavior by resisting staff, refusing staff directives and verbally threatening to assault staff. Inmate Cratty continued his disruptive behavior by threatening staff and kicking staff. An attempt to place inmate Cratty to soft ambulatory restraint was made at 3:10 p.m. at which time inmate Cratty aggressively pulled away from staff and threatened to physically assault staff.

The DHO considered that you made no statement to the investigator or to the UDC.

The DHO considered your statement to the DHO, "I told them I had a mental health crisis the day before. I smoked a tiny piece of deuce, and I could walk through the gate. I was bleeding from my head and went into the Lt's office and ran at Reynolds and he restrained me, and I started talking crazy."

The DHO considered your statement to the charge against you but was not convinced. You claim you smoked a piece of "deuce" prior to the incident and thought you could walk through the gate and then decided to run at lieutenant Renyolds. This statement supports the charge of attempted assault as described in the incident report. The DHO believes you would attempt to deny the charge to avoid possible disciplinary sanctions, if found guilty. The DHO finds no evidence, nor did you provide evidence, to indicate the staff member conspired to falsely accuse you of this misconduct. There were multiple witnesses to this event. The DHO finds the staff member's statement and observations are more credible and believable than yours. The DHO based the decision on the greater weight of the evidence. Greater weight is given to the incident report, photographic evidence, and your disciplinary history.

Therefore, based on the evidence outlined above, and your admission, the DHO finds some facts to support that you committed the prohibited act of Code 224: Assaulting without Serious Injury.

---

VI.    SANCTION OR ACTION TAKEN
224A (FREQ 1)-DIS GCT 27 DAYS, 224A (FREQ 1)-DS 5 DAYS, 224A (FREQ 1)-LP EMAIL 4 MONTHS

When imposing a sanction of Disciplinary Segregation (DS), The Discipline Hearing Officer considered the time served as a primary means when calculating your sanction of (DS). This may not always be a viable option, due to concerns related to the safety of staff, safety of inmates or safety and security of the institution.

---

VII.   REASON FOR SANCTION OR ACTION TAKEN
The action/behavior on the part of any inmate to assault, attempt to assault or assist in assaulting any other inmate or person poses a threat to the health, safety, and welfare of not only him, but all other inmates and staff within the institution and disrupts the orderly running of the institution. In the past, assaults on another have expanded to include others which created a larger problem for staff to resolve.

Prescribed by P5270                         Replaces BP-304(52) of Jan 88

3



| BP-A0304 | DISCIPLINE HEARING OFFICER REPORT | IR#: 4127779 |
|---|---|---|
| | | Reg#: 43951-480 |
| Dept. of Justice / Federal Bureau of Prisons | | CRATTY, SHANE |

**The DHO disallowed good conduct time for this act in order to meet this inmate's sentence requirements. (PLRA) if sentenced in the future. The sanction imposed by the DHO were taken to let the inmate know that he, and he alone will be held responsible for his action/behavior at all times, to hold the inmate accountable for his actions in relation to having committed this prohibited act, while also serving as a deterrent to prevent any future misconduct.**

VIII.  APPEAL RIGHTS:  **X**  The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.    Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| **T. RICE** | **T. RICE** | **08-19-2025** |

DHO Report Delivered to Inmate by:

| O. Shelp | _MN_ | 08-25-25    0/445 |
|---|---|---|
| Printed Name of Staff | Signature of Staff | Date & Time Delivered |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Prescribed by P5270                                    Replaces BP-304(52) of Jan 88

4

BP-A0304     **DISCIPLINE HEARING OFFICER REPORT**    IR#: 4130380

Reg#: 43951-480

CRATTY, SHANE

Dept. of Justice / Federal Bureau of Prisons

| | |
|---|---|
| Institution: **BUTNER MED II FCI** | Incident Report Number: **4130380** |
| NAME OF INMATE: **CRATTY, SHANE** | REG.NO.: **43951-480**   UNIT: **2 GP** |
| Date of Incident Report: **06-09-2025** | Offense Code(s): **208 307** |
| Date of Incident: **06-09-2025** | |

Summary of Charges:

    **208 – INTERFERING WITH SECRY DEVICES. 307 – REFUSING TO OBEY AN ORDER.**

I.    NOTICE OF CHARGE(S)

    A.   Advanced written notice of charge (copy of Incident Report) was given to inmate on **06-10-2025**    at **0845 hrs**   (by staff member) **M. GILLISPIE**

    B.   The DHO Hearing was held on **07-10-2025**     at **0733 hrs**

    C.   The inmate was advised of the rights before the DHO by (staff member):

      **Griffin**        on   **06-11-2025**

      and a copy of the advisement of rights form is attached.

    D.   Delay in Process   **None**

II.   STAFF REPRESENTATIVE

    A.   Inmate waived right to staff representative:   [Yes] **X**     [No] __

    B.   Inmate requested staff representative and             appeared.

      **NA**

    C.   Staff Representative's Statement:

      **NA**

    D.   Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that:

      **NA**

    E.   Staff representative   **NA**          was appointed.

III.   PRESENTATION OF EVIDENCE

    A.   Inmate ( **X** ) admits    (   ) denies the charge(s).

    B.   Summary of Inmate Statement:

      Inmate Cratty acknowledged that he had received a copy of the incident report and that he understood his rights before the DHO. Inmate Cratty I did not raise any issues or expressed any concerns with the discipline process to this point.

      Inmate Cratty admitted to the charge, providing a statement "I did cover the window up. I told them several times I was having a mental health crisis. I told them I was going to cover up the window if psych didn't come down here." Inmate Cratty did not provide any documentary evidence for the DHO to consider, nor requested video footage be reviewed at any stage of the disciplinary process.

**0106**

**BP-A0304**     **DISCIPLINE HEARING OFFICER REPORT**     IR#:  4130380
Reg#: 43951-480
Dept. of Justice / Federal Bureau of Prisons     CRATTY, SHANE

C.   Witnesses

1.   The inmate waived right to witnesses.  [Yes] **X**     [No] __

2.   The following persons were called as witness at this hearing and appeared
     (Each witness name and statement listed below):
     **NA**

3.   The following persons requested were not called for the reason(s) given
     (Each witness name and statement listed below):
     **NA**

4.   Unavailable witnesses were requested to submit written statements and
     those statements received were considered (Each witness name and
     statement listed below):
     **NA**

D.   Documentary Evidence. In addition to the Incident Report and
     Investigation, the DHO considered the following documents:
     **Incident Report - Medical Assessments -- (BOP-IRMEDA)**
     **Incident Report - Photographs -- (BOP-IRPHO)**
     **Incident Report - Staff Memorandums -- (BOP-IRMEM)**

E.   Confidential information was used by DHO in support of his findings, but
     was not revealed to the inmate. The confidential information was documented
     in a separate report. The confidential information has been (confidential
     informants have been) determined to be reliable because:
     **NA**

IV.   FINDINGS OF THE DHO
     _ A. The act was committed as charged.     _ C. No prohibited act was committed:
     **X** B. The following act was commmitted:         Expunge according to inmate
     208                                                discipline PS.

V.   SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations
     written documents, etc.)
     This hearing was conducted while inmate Cratty was on suicide watch at the request of institution
     psychology staff. The DHO first ensured the inmate received a copy of the incident report,
     understood his rights, was not requesting the assistance of a staff representative, did not wish to
     call witnesses, had no documentary evidence to present and was not requesting video evidence be
     reviewed at any stage of the disciplinary process. It was noted on your Mental Health Evaluation
     you were found competent to participate in the disciplinary process and responsible for your
     actions at the time of the incident. You were provided Mental Health Evaluation for review prior to
     attempting to initiate the hearing.

     The DHO finds you have committed the prohibited act of Interfering with Security Devices, Code
     208, while housed at the Federal Correctional Institution II, Butner, North Carolina. The specific
     evidence relied upon to support this finding was the statement of B. Hackett, provided in the form
     of a written report (incident report) stating the following:

Prescribed by P5270                              Replaces BP-304(52) of Jan 88

2



| BP-A0304 | **DISCIPLINE HEARING OFFICER REPORT** | IR#: 4130380 |
|---|---|---|
| | | Reg#: 43951-480 |
| Dept. of Justice / Federal Bureau of Prisons | | CRATTY, SHANE |

On June 9, 2025, at approximately 1:00 p.m., I was in the FCI 2 Butner Special Housing Unit conducting rounds on C Range. When I got to cell 142, assigned to inmates Cratty, Shane, Reg. No. 43951-480, and Donald, Bruce, Reg. No. 26471-058 I saw that the window was covered with paper and an inmate was aggressively yelling at staff. I gave multiple verbal commands to the inmates to remove the paper so I could see into the cell, which they refused. Once additional staff arrived with a shield, inmate Cratty removed the covering from the window, continuing to scream at me. I ordered both inmates to submit to hand restraints, to which they complied. Inmate Cratty was removed from the cell and escorted to a holding cell.

The DHO considered your statement to the Investigator that you were trying to get psychology for a mental health crisis and took it down when told to do so and that this shot was retaliation due to telling Hackett you were putting a PREA on him,

The DHO considered your statement to the UDC, "It was retaliation cause I said I was going to file a PREA.

The DHO considered your statement to the DHO, "I did cover the window up. I told them several times I was having a mental health crisis. I told them I was going to cover up the window if psych didn't come down here."

This finding is further based upon the testimony you provided, in which you admitted guilt. Regardless of your other statements, you admit to covering the window of your cell up, in violation of BOP policy. This statement corroborates the charge Interfering with any locking device, code 208, made by the reporting officer and as documented in the written report.

Therefore, based on the evidence outlined above, and your admission, the DHO finds some facts to support that you committed the prohibited act of Interfering with any locking device, code 208.

VI.   SANCTION OR ACTION TAKEN
208 (FREQ 1)-DIS GCT 27 DAYS, 208 (FREQ 1)-LP VISIT 4 MONTHS

When imposing a sanction of Disciplinary Segregation (DS), The Discipline Hearing Officer considered the time served as a primary means when calculating your sanction of (DS). This may not always be a viable option, due to concerns related to the safety of staff, safety of inmates or safety and security of the institution.

VII.   REASON FOR SANCTION OR ACTION TAKEN
Blocking or interfering with any type of locking device or security procedure hampers staff's ability to maintain the security and orderly operation of the institution. The staff are entitled to a safe and orderly environment in which to work, and inmates are entitled to a safe and orderly environment in which to live. This sort of behavior disrupts and interferes with that and must be strongly discouraged.

The DHO disallowed good conduct time for this act in order to meet this inmate's sentence requirements. (PLRA). The sanction imposed by the DHO were taken to let the inmate know that he, and he alone will be held responsible for his action/behavior at all times, to hold the inmate accountable for his actions in relation to having committed this prohibited act, while also serving as a deterrent to prevent any future misconduct.

Prescribed by P5270                          Replaces BP-304(52) of Jan 88

| BP-A0304 | **DISCIPLINE HEARING OFFICER REPORT** | IR#:  4130380 |
|---|---|---|
| | | Reg#: 43951-480 |
| Dept. of Justice / Federal Bureau of Prisons | | CRATTY, SHANE |

VIII.  APPEAL RIGHTS:  **X**  The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.   Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| **T. RICE** | **T. RICE** | **08-19-2025** |

DHO Report Delivered to Inmate by:

| O.Shelp | _(signature)_ | 08-25-25   1445 |
|---|---|---|
| Printed Name of Staff | Signature of Staff | Date & Time Delivered |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

4

BP-A0304    **DISCIPLINE HEARING OFFICER REPORT**    IR#:  4140294
Reg#: 43951-480
CRATTY, SHANE

Dept. of Justice / Federal Bureau of Prisons

| | |
|---|---|
| Institution: **BUTNER MED II FCI** | Incident Report Number: **4140294** |
| NAME OF INMATE: **CRATTY, SHANE** | REG.NO.: **43951-480**    UNIT: **2 GP** |
| Date of Incident Report: **06-29-2025** | Offense Code(s): **203 224** |
| Date of Incident: **06-29-2025** | |

Summary of Charges:
**203 -- THREATENING BODILY HARM. 224 -- ASSAULTING W/O SERIOUS INJURY.**

I.  NOTICE OF CHARGE(S)

A.  Advanced written notice of charge (copy of Incident Report) was given to
inmate on **07-02-2025**  at **1038 hrs**  (by staff member) **J. CRISS**

B.  The DHO Hearing was held on **07-10-2025**  at **0739 hrs**

C.  The inmate was advised of the rights before the DHO by (staff member):
**Griffin**  on **07-03-2025**

and a copy of the advisement of rights form is attached.

D.  Delay in Process **MHE and suicide watch**

II. STAFF REPRESENTATIVE

A.  Inmate waived right to staff representative:  [Yes] **X**  [No] _

B.  Inmate requested staff representative and  appeared.
**NA**

C.  Staff Representative's Statement:
**NA**

D.  Requested staff representative declined or could not appear but inmate
was advised of option to postpone hearing to obtain another staff
representative with the result that:
**NA**

E.  Staff representative **NA**  was appointed.

III. PRESENTATION OF EVIDENCE

A.  Inmate **neither admits nor denies the charge(s).**

B.  Summary of Inmate Statement:
Inmate Cratty acknowledged that he had received a copy of the incident report and that he
understood his rights before the DHO. Inmate Cratty I did not raise any issues or expressed
any concerns with the discipline process to this point.

Inmate Cratty neither confirmed or denied the charge, provided a statement "I tried to grab
his arm because I slipped on the floor. I don't talk like that. They were aggressive and abused
me." Inmate Cratty did not provide any documentary evidence for the DHO to consider, nor
requested video footage be reviewed at any stage of the disciplinary process.

Prescribed by P5270                    Replaces BP-304(52) of Jan 88

2



**BP-A0304**    **DISCIPLINE HEARING OFFICER REPORT**    IR#:  4140294
Reg#: 43951-480
Dept. of Justice / Federal Bureau of Prisons    CRATTY, SHANE

C.    Witnesses

1.    The inmate waived right to witnesses.  [Yes] **X**    [No] _

2.    The following persons were called as witness at this hearing and appeared
(Each witness name and statement listed below):
**NA**

3.    The following persons requested were not called for the reason(s) given
(Each witness name and statement listed below):
**NA**

4.    Unavailable witnesses were requested to submit written statements and
those statements received were considered (Each witness name and
statement listed below):
**NA**

D.    Documentary Evidence. In addition to the Incident Report and
Investigation, the DHO considered the following documents:
**Incident Report - Medical Assessments -- (BOP-IRMEDA)**
**Incident Report - Staff Memorandums -- (BOP-IRMEM)**
**Incident Report - Medical Memorandums -- (BOP-IRMEDM)**
**Incident Report - Photographs -- (BOP-IRPHO)**

E.    Confidential information was used by DHO in support of his findings, but
was not revealed to the inmate. The confidential information was documented
in a separate report. The confidential information has been (confidential
informants have been) determined to be reliable because:
**NA**

IV.    FINDINGS OF THE DHO
**X**  A. The act was committed as charged.    _ C. No prohibited act was committed:
_  B. The following act was commmitted:        Expunge according to inmate
discipline PS.

V.    SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations
written documents, etc.)
This hearing was conducted while inmate Cratty was on suicide watch at the request of institution
psychology staff. The DHO first ensured the inmate received a copy of the incident report,
understood his rights, was not requesting the assistance of a staff representative, did not wish to
call any witnesses, had no
documentary evidence to present and was not requesting video evidence be reviewed at any stage
of the disciplinary process. It was noted on your Mental Health Evaluation you were found
competent to participate in the disciplinary process and responsible for your actions at the time of
the incident. You were provided Mental Health Evaluation for review prior to attempting to initiate
the hearing.

The DHO finds you have committed the prohibited act Code 224: Assaulting without Serious Injury,
as well as Code 203 Threatening Bodily Harm while incarcerated at FCI 2 Butner, North Carolina.
The specific evidence relied upon to make this finding was the

Prescribed by P5270                    Replaces BP-304(52) of Jan 88

3

0111



**BP-A0304**      DISCIPLINE HEARING OFFICER REPORT      IR#:  4140294
Reg#: 43951-480
CRATTY, SHANE

Dept. of Justice / Federal Bureau of Prisons

reporting officer's written report, who reported the following:

At approximately 0947am I, Officer Blake, went down to medical to assist getting the tear resistant blanket from Inmate CRATTY, SHANE, #43951-480. Inmate Cratty began threatening staff by stating "I'll punch every police that comes into this cell. Once we retrieved the tear resistant blanket I turned around and inmate Cratty grabbed my wrist. I used the minimum amount of force necessary to place inmate Cratty into hand restraints. Inmate Cratty was then escorted to SHU.

The DHO considered that you made no statement to the investigator or to the UDC.

The DHO considered your statement to the DHO, "I tried to grab his arm because I slipped on the floor. I don't talk like that. They were aggressive and abused me."

The DHO considered your statement to the charge against you but was not convinced. You claim you grabbed the officer's arm because you slipped. Video evidence was reviewed and at no time did it appear that you slipped. In fact, video shows you waited until the officer turned to walk out the room and then you grab his arm as soon as his back was to you. Video review discredits your claim and defense. The DHO believes you would deny the charge to avoid possible disciplinary sanctions, if found guilty. The DHO finds no evidence, nor did you provide evidence, to indicate the staff member conspired to falsely accuse you of this misconduct. There were multiple witnesses to this event. The DHO finds the staff member's statement and observations are more credible and believable than yours. The DHO based the decision on the greater weight of the evidence. Greater weight is given to the incident report, video evidence, and the fact you stated, "I'll punch every police that comes into this cell."

Therefore, based on the evidence outlined above, and your admission, the DHO finds some facts to support that you committed the prohibited act of Code 224: Assaulting without Serious Injury as well as Code 203 Threatening Bodily Harm

VI.    SANCTION OR ACTION TAKEN
203 (FREQ 1)-DIS GCT 27 DAYS, 203 (FREQ 1)-DS 5 DAYS, 203 (FREQ 1)-LP COMM 4 MONTHS, 224 (FREQ 2)-DIS GCT 27 DAYS, 224 (FREQ 2)-DS 5 DAYS, 224 (FREQ 2)-FF NVGCT 27 DAYS, 224 (FREQ 2)-LP TABLET 4 MONTHS

When imposing a sanction of Disciplinary Segregation (DS), The Discipline Hearing Officer considered the time served as a primary means when calculating your sanction of (DS). This may not always be a viable option, due to concerns related to the safety of staff, safety of inmates or safety and security of the institution.

VII.   REASON FOR SANCTION OR ACTION TAKEN
The action/behavior on the part of any inmate to assault, threaten to assault, attempt to assault or assist in assaulting any other inmate or person poses a threat to the health, safety, and welfare of not only him, but all other inmates and staff within the institution and disrupts the orderly running of the institution. In the past, assaults on another have expanded to include others which created a larger problem for staff to resolve.

The action/behavior on the part of any inmate to threaten any person poses a serious threat to the health, safety, and welfare of not only the person(s) involved, but that of all other inmates and staff. In the past, evidence has clearly shown threats to be carried out by inmates, or other inmates who may have witnessed the threat being made. This type of behavior will not be tolerated. The sanctions imposed by the DHO were to let the inmate know he, and he alone, will be held responsible for his actions/behavior at all times.

The DHO disallowed good conduct time for this act in order to meet this inmate's sentence

Prescribed by P5270                                  Replaces BP-304(52) of Jan 88

4

0112

 **BP-A0304**    **DISCIPLINE HEARING OFFICER REPORT**    IR#:    4140294

Reg#:  43951-480

Dept. of Justice / Federal Bureau of Prisons    CRATTY, SHANE

requirements. (PLRA) if sentenced in the future. The sanction imposed by the DHO were taken to let the inmate know that he, and he alone will be held responsible for his action/behavior at all times, to hold the inmate accountable for his actions in relation to having committed this prohibited act, while also serving as a deterrent to prevent any future misconduct.

VIII.   APPEAL RIGHTS:  **X**   The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.    Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| **T. RICE** | **T. RICE** | **08-19-2025** |

DHO Report Delivered to Inmate by:

| D. Shelp | [signature] | 8-25-25   1445 |
|---|---|---|
| Printed Name of Staff | Signature of Staff | Date & Time Delivered |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Prescribed by P5270                    Replaces BP-304(52) of Jan 88

**0113**

# EXHIBIT E

Filed Under Seal

# EXHIBIT F

# SWANSON & McNAMARA

300 Montgomery Street
Suite 1100
San Francisco, CA 94104
www.swansonmcnamara.com
Tel        (415) 477-3800
Fax        (415) 477-9010

December 5, 2025

**Via email and certified mail**

Warden
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472
CAA-ExecAssistant-S@bop.gov

           Re:    **Shane Cratty – Request for Compassionate Release**

To Whom it May Concern:

           We write as counsel for Shane Cratty, Register Number 43951-480.  We understand Mr. Cratty would like to submit a request for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1), to reduce his original sentence of 96 months to time served.  We write to make this request on Mr. Cratty's behalf.  Mr. Cratty makes this request because of his extraordinary and compelling mental health deterioration and the BOP's inability to provide adequate care.  Mr. Cratty's mental health has deteriorated to the point that continued incarceration poses a serious and immediate threat to his safety.  If released, Mr. Cratty will transfer to a residential treatment program to receive the continuous clinical care he urgently needs.

           Since at least June 3, 2025, Mr. Cratty has experienced an escalating psychiatric crisis while located at FCI Butner Medium II.  He was repeatedly placed on suicide watch, has engaged in hunger strikes, and has exhibited symptoms consistent with profound depression, hopelessness, and psychological destabilization.  These episodes have not been isolated or situational, they represent a sustained and ongoing mental health emergency.  Staff have repeatedly recognized the severity of his condition through suicide watch placements, yet his overall mental health continues to deteriorate.

           Rather than receiving clinically appropriate intervention, Mr. Cratty was issued disciplinary infractions during this crisis for conduct that was plainly driven by his psychiatric state.  These sanctions resulted in a loss of good conduct time and other privileges.  Further, he says that he now faces an increased security classification due to these disciplinaries, which has triggered a transfer to a United States Penitentiary.  The use of discipline as a response to a mental health emergency has exacerbated his instability and contributed directly to his current deterioration.

           Program Statement 5050.50 provides that "extraordinary and compelling" reasons exist where the BOP is unable to provide appropriate medical care, or when an inmate suffers from a

**0118**

# SWANSON & McNAMARA

December 5, 2025
Page 2

debilitating condition that substantially diminishes their ability to function within a correctional environment.  *See* Fed. Bureau of Prisons, Program Statement 5050.50 at 5–7 (Jan. 17, 2019).  Mr. Cratty's current circumstances fall squarely within this framework.  The BOP has not been able to meet his clinical needs, and his continued incarceration under these conditions endangers his safety.

For these reasons, we respectfully request that Mr. Cratty be granted compassionate release.  Thank you for your consideration.

Sincerely,

_____
SWANSON & MCNAMARA LLP
Mary McNamara
Hannah Pollack

0119

# EXHIBIT G



**U.S. Department of Justice**

Federal Bureau of Prisons

*United States Penitentiary Canaan*

*Post Office Box 400*
*Waymart, Pennsylvania 18472*

*Office of the Warden*

January 5, 2026

Mary McNamara & Hannah Pollack, Swanson & McNamara
300 Montgomery St., Suite 1100
San Franciso, CA 94104

Dear Ms. McNamara,

This is in response to your correspondence which was received at this facility on December 8, 2025.   In your request, you have stated that you represent inmate Cratty, Shane Reg. No. 43951-480, an inmate currently housed at USP Canaan. You have requested that we grant a compassionate release based on the Bureau of Prisons (BOP) inability to provide adequate mental health care and "extraordinary and compelling" reasons on inmate Cratty's behalf.

To assist with this matter, a review of Cratty's information was conducted. It was determined that he arrived at this facility on December 4, 2025, for continued service of his sentence. In your request for consideration of compassionate release/reduction in sentence, you have stated specific "extraordinary and compelling" circumstances to include the inability of the BOP to provide adequate mental health treatment for Mr. Cratty.

Cratty's case has been reviewed consistent with Program Statement 5050.50 Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. 3582(c)(1) and found to not meet the criteria as outlined within the program statement.

Additionally, the Bureau of Prisons does not have the authority, through its compassionate release/reduction in sentence procedures, to reduce an inmate's sentence based on sentencing disparities or the amendment of the sentencing guidelines. However, you may petition the court that imposed the sentence on him, for possible relief.

I trust this response has addressed your concerns. If you have any additional questions or require further assistance, please do not hesitate to contact me.

Sincerely,

E. Garza,
Warden

**0120**

# SWANSON & McNAMARA

300 Montgomery Street
Suite 1100
San Francisco, CA 94104
www.swansonmcnamara.com
Tel        (415) 477-3800
Fax        (415) 477-9010

December 5, 2025

**Via email and certified mail**

Warden
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472
CAA-ExecAssistant-S@bop.gov

**Re:   Shane Cratty – Request for Compassionate Release**

To Whom it May Concern:

We write as counsel for Shane Cratty, Register Number 43951-480. We understand Mr. Cratty would like to submit a request for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1), to reduce his original sentence of 96 months to time served. We write to make this request on Mr. Cratty's behalf. Mr. Cratty makes this request because of his extraordinary and compelling mental health deterioration and the BOP's inability to provide adequate care. Mr. Cratty's mental health has deteriorated to the point that continued incarceration poses a serious and immediate threat to his safety. If released, Mr. Cratty will transfer to a residential treatment program to receive the continuous clinical care he urgently needs.

Since at least June 3, 2025, Mr. Cratty has experienced an escalating psychiatric crisis while located at FCI Butner Medium II. He was repeatedly placed on suicide watch, has engaged in hunger strikes, and has exhibited symptoms consistent with profound depression, hopelessness, and psychological destabilization. These episodes have not been isolated or situational, they represent a sustained and ongoing mental health emergency. Staff have repeatedly recognized the severity of his condition through suicide watch placements, yet his overall mental health continues to deteriorate.

Rather than receiving clinically appropriate intervention, Mr. Cratty was issued disciplinary infractions during this crisis for conduct that was plainly driven by his psychiatric state. These sanctions resulted in a loss of good conduct time and other privileges. Further, he says that he now faces an increased security classification due to these disciplinaries, which has triggered a transfer to a United States Penitentiary. The use of discipline as a response to a mental health emergency has exacerbated his instability and contributed directly to his current deterioration.

Program Statement 5050.50 provides that "extraordinary and compelling" reasons exist where the BOP is unable to provide appropriate medical care, or when an inmate suffers from a

**0121**

## SWANSON & McNAMARA

December 5, 2025
Page 2

debilitating condition that substantially diminishes their ability to function within a correctional environment. *See* Fed. Bureau of Prisons, Program Statement 5050.50 at 5–7 (Jan. 17, 2019). Mr. Cratty's current circumstances fall squarely within this framework. The BOP has not been able to meet his clinical needs, and his continued incarceration under these conditions endangers his safety.

For these reasons, we respectfully request that Mr. Cratty be granted compassionate release. Thank you for your consideration.

Sincerely,

SWANSON & MCNAMARA LLP
Mary McNamara
Hannah Pollack

0122