Mary McNamara, SBN 147131
mary@smllp.law
Hannah Pollack, SBN 336599
hannah@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for SHANE CRATTY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHANE CRATTY,<br><br>Defendant. | Case No. CR 19-o681 CRB<br><br>**DECLARATION OF SHANE CRATTY IN SUPPORT OF DEFENDANT SHANE CRATTY'S MOTION FOR COMPASSIONATE RELEASE TO INPATIENT TREATMENT FACILITY**<br><br>Date:  TBD<br>Time:  TBD<br>Dept.:  Courtroom 6, 17th Floor<br>Judge:  Hon. Charles R. Breyer |

I, Shane Cratty, declare as follows:

(1)    I am the defendant in the above-referenced case and am currently incarcerated at USP Canaan, Pennsylvania.  I have personal knowledge of the matters stated here and, if called as a witness, I could and would testify competently to them.

(2)    On December 11, 2019, I was arrested and ultimately detained at Santa Rita Jail.  I remained at Santa Rita until my transfer to BOP custody two and a quarter years later in March 2022.  I had no disciplinary violations at Santa Rita except for one for having a torn sheet (common in the jails so that inmates can tie the ends to the bed to stop the sheets from slipping).  I was able to stay opioid free—I was on the Medication Assisted Treatment ("MAT") program and taking Subutex, which is a medication containing buprenorphine and is used to treat opioid addiction.  I consistently received and took my prescribed medications, Wellbutrin (for major depressive disorder) and Doxepin (for depression and anxiety) and Santa Rita accommodated my other medical needs.  For example, I was allowed to use my dental appliance—a sort of denture, to help me chew, due to my loss of teeth after extractions.  Santa Rita also provided me a gastric soft diet to help me chew and to manage my cyclic vomiting condition.

(3)    In March 2022, I was transferred into BOP custody at FCI Sheridan, Washington, a medium security facility.  At Sheridan, I was placed in Mental Health Care Level 1, for those considered generally healthy with minimal needs.  I was changed to Mental Health Care Level 2 four months after I got to Sheridan.  Mental Health Care Level 2 is for those with largely stable conditions managed by medication.  Inmates in Level 2 do not receive individual treatment from Psychology, which I needed.  At the beginning of my time at Sheridan, staff did not provide the prescribed medications that I had been provided at Santa Rita, specifically Wellbutrin and Doxepin.  As a consequence of missing my medications, I began to hear voices, and I suffered acute lack of sleep.  I urgently requested my prescribed medications but did not receive them. After five or six days of being off the medications and being tormented by voices and lack of sleep, I ingested a nerve pain medication called Oxcarbazepine (which I understand to be a mood stabilizer), to try to sleep. The Oxcarbazepine

2

caused me not to be able to stand up.  Staff became physically abusive to me but took me to hospital briefly and then to suicide watch, which I remained on for 5 days.  On the third day on suicide watch, I received Doxepin but I was never given Wellbutrin.

(4)      While at Sheridan, during the Oxcarbazepine incident, staff took my dental appliance.  I never received another dental appliance to help me chew food and I was never given a gastric soft diet.

(5)      Illicit drugs are freely available at Sheridan and I relapsed by smoking K2, a synthetic marijuana.  In June 2022, I attempted suicide using my bed sheet.  My cell mate intervened after he saw me hanging the sheet on the window bars, preventing me from carrying through.  In August 2022, I ingested 15 Tylenol pills.  I never received Wellbutrin while in Sheridan.

(6)      I got into fights at Sheridan and was placed in the SHU.  I spent a substantial amount of time in segregation while at Sheridan, which caused my symptoms to worsen.  I had received a recommendation for a dual diagnosis Residential Drug Abuse Program ("RDAP).  Since there was no other dual diagnosis program at a medium facility on the west coast, participation could be accomplished only if I were to be transferred to a facility with dual diagnosis RDAP in another region.  My parents, with whom I have a close and loving relationship, hired a prison consultant in an effort to help me obtain a transfer.  Whether due to the consultant's work or as a result of BOP's own decision, on or about July 2023, I was transferred to FCI Butner II in North Carolina, another medium security facility.  While Butner was located across the country and therefore very far away from my parents, I desperately wanted the transfer because I needed to be in the RDAP program.

(7)      Although I was housed in the RDAP unit at Butner, I was left on the waitlist to participate in the actual program.  During that waitlist period, which lasted one year, I did not receive the intensive treatment and therapy that the 500-hour RDAP program provides.  I became hopeless and frustrated by the delay.  I relapsed and was removed from the RDAP floor after the psychologist who runs the RDAP program refused my request to cell with an

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

established positive sober peer in the RDAP community who could assist me in sobriety. Instead, she moved arriving inmates who were active drug users into my cell.

(8)     While at Butner, dentistry staff removed more of my teeth.  I now have only 13 teeth remaining.  Despite this, I was not provided a gastric soft diet at Butner either.  Chewing was either painful or impossible.  By this time, I had been without a gastric soft diet for two years.

(9)     Between February and May 2025, my mental health became very unstable. I was severely depressed and not compliant with the medication regimen at Butner. I began taking more and more drugs which were as freely available at Butner as they were at Sheridan.  I had recurrent bouts of vomiting and increasingly erratic eating patterns.  I became increasingly agitated.  On May 29, I began to vomit blood and went to the medical department.  The doctor did not believe there was anything wrong with me.  The staff did not help me because they viewed my symptoms as purely drug-related.

(10)    I entered a deeper mental health crisis in June 2025. This manifested in a series of incidents that BOP punished me for.  The first incident was on June 3, 2025, when, after taking drugs I hallucinated that I could walk into another dimension of time and attempted to run head-first through a metal gate.  When I crashed into the gate, I turned around and then went to the lieutenant's office.  I was subdued there by three staff members.  Other staff members joined them and took me to the SHU, where I was placed on a two-foot high concrete slab with indentations for handcuffs and restraints.  My feet were shackled at the bottom of the bunk and my arms were pulled above my head. They are supposed to use separate cuffs so arms are apart, but the guards chained both of my arms in one direction.  This position caused intense pain.  I had sustained lacerations to my forehead and nose from crashing into the gate and now had injuries to my arms and feet from being dragged and restrained afterwards.  BOP kept me in the SHU and did not provide any mental health treatment.  Instead, I was charged with assault without serious injury (attempt) and threatening bodily harm.

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

(11)    The second incident occurred on June 9, while I was still in the SHU.  I felt highly anxious and panicked and told staff I was experiencing a mental health crisis and was not receiving adequate treatment.  Out of desperation, I told the officer on duty that if Psychology was not contacted, I would cover my cell window to force staff to respond to me.  When I finally did so because staff was not responding to my calls for help, a lieutenant arrived at my cell and ordered me to uncover the window.  I complied and removed the covering and told the lieutenant I was experiencing a mental health crisis and needed to see Psychology staff.  The lieutenant restrained me and began to verbally abuse me.  The lieutenant then brought me to a dry cell (where there are no cameras) and two other officers joined him.  The lieutenant slammed me to the back the of cell, yelling at me.  He ordered me to strip naked, while verbally abusing me with sexually aggressive language (calling me a "little bitch" and saying I was "not a man").  The lieutenant and grabbed my left buttock.  He then put me in a paper suit, applied wrist shackles tied to a waist chain with a black restraint box and continued the aggressive verbal abuse.  After the required medical assessment following the use of these restraints, I told medical staff that I had been sexually abused and I requested to file a complaint under the Prison Rape Elimination Act (PREA), which I subsequently did.  The lieutenant then filed an incident report charging me with misusing a security device (covering the cell window).

(12)    On June 12 or 13, while I was still in the SHU, the lieutenant continued to intimidate me, telling me that this was his SHU and he could do what he liked to me.  I asked to be placed on suicide watch in part out of fear of retaliation for filing the PREA claim against him.  While on suicide watch, I was denied clothing except for boxer shorts even though the temperature in the cell was extremely cold—the air conditioner was going full blast—and inmate observers in the SHU were wearing extra clothing like sweatshirts and thermals to cope with the freezing temperature.  Although there was a metal shower, I was not given soap or a towel.  While there, through the glass walls of the suicide cells, I witnessed the death of the inmate in the adjacent cell after the inmate's call for help for chest pains went unanswered until he became

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

unresponsive. Another inmate told me later that that same inmate had been making similar allegations against the lieutenant who abused me.

(13)    By June 19, I was both psychiatrically destabilized and physically depleted from lack of a proper diet. I had now lost access to commissary and could not obtain fruit or soft foods, and I still was not receiving a soft diet. I began a hunger strike in protest. It took six days for a physician to approve a soft diet. It took two to three weeks for me to receive it consistently. Even then, the soft diet was not compliant with requirements, e.g., items were missing. By this time, I weighed less than 130 pounds, down from the 190 pounds I weighed at the time of sentencing.

(14)    Between June 19 and June 29, I had repeated bouts of chest pain. I believed that BOP staff was waiting for me to die. On or around June 27, the deputy chief psychologist (who also who ran the RDAP) did come to my cell, but it was while I was naked and using the toilet. With the memories of the lieutenant's sexualized abuse of me fresh in my mind, I panicked. I saw the psychologist staring at me. The compound officer came in and I told the compound officer I would file a PREA complaint against the psychologist. In retaliation, staff did not bring me dinner that evening. I then got into a dispute with staff when I withheld a toilet plunger in an effort to bargain for food. Staff handcuffed me and slammed me into a glass window.

(15)    On June 28, I stuck my arm out of the tray slot to protest not getting dinner. Guards slammed my arm into the door slot of the cell, injuring my elbow. I began to experience chest pains again later that evening. While staff did administer an EKG, they did so without a doctor's being present and seemed unsure about the results, leaving me confused and very frightened. Staff sent me back to suicide watch. They did not treat the injuries to my elbow.

(16)    The third incident occurred on June 29 when a psychologist intern came to remove my tear-resistant blanket. I had been covering my head with it in an effort to stay warm, which I understand is not an infraction unless one is given an order to remove it and disobeys that order. I became agitated and refused to give up the blanket. Two officers and the lieutenant

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

came into the cell and assaulted me. As I was falling against the shower, I held onto the wrist of one of the officers in an effort to stabilize myself. Staff immediately restrained me and took me back to the SHU where I remained on hunger strike. After a number of hours, they brought me back to suicide watch. I was in extreme mental anguish and believed I was going insane.

(17)   A fourth incident occurred on July 9, when I told the psychologist that I was hearing voices telling me to kill her and other staff members, including the warden, for dehumanizing inmates. I was very disturbed by the voices. I specifically told the psychologist about what the voices were telling me to do because I was concerned for staff safety and my own safety and to make sure I would not somehow act on these thoughts. The psychologist documented this as a disciplinary matter, writing me up for making threats.

(18)   On July 10, 2025, the day after I heard the voices, and while I was still on suicide watch, the BOP held disciplinary hearings on the three June incidents. The hearing officer disposed of all three in approximately five minutes each. Despite my explaining to the hearing officer that I had been suffering a mental health crisis at the time of the incidents and was still not in a mental state where I could properly defend myself, the hearing officer sustained each charge and imposed the maximum available punishment. BOP forfeited approximately three months of good-conduct time (approximately one month per incident). This lengthened my sentence, changing my release date from December 24, 2026 to March 15, 2027. BOP also stripped me of key stabilizing privileges, including access to the telephone and email, which cut off all communication with my parents. I was also deprived of access to commissary, which was important to my obtaining a reliable supply of soft food that I could chew. The incidents resulted in the warden issuing a memo that excluded me from getting any halfway house time at all. I did not find out about the exclusion memo until I arrived at Canaan and was told about it by my case manager.

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

(19)    I appealed these decisions, explaining that I was having a mental health crisis during these incidents, lacked intent to violate the rules and was not competent to participate in the proceedings while still on suicide watch.  BOP issued no response.

(20)    On November 12, without explanation or justification, I was informed that my security classification had been changed from medium to high and that I was being designated to a United States Penitentiary.  The transport to the USP took three weeks.  In December 2025, I arrived at USP Canaan.  I remain at USP Canaan at this time.

(21)    The atmosphere at Canaan is extremely intimidating.  Gangs control the prison and I am forced to associate with gang members for protection.  I believe all inmates are armed with shanks for self protection.  Lockdowns occur frequently due to violence.  When we are on lockdown, I cannot leave my cell except to shower three times per week.  I am terrified of being attacked due to my mental and physical illnesses.  I told the head psychologist that I had been having suicidal thoughts.  When I asked for a program, she said she would see if the Challenge program would be a good fit.  Five people who came on a bus with me to Canaan have been admitted to Challenge, but I have not.  I feel it is only a matter of time before someone attacks or kills me in the general population.  I am still not getting soft diet, even though the doctor renewed the soft diet order three weeks ago.

///

8

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB

(22)   My attorney, Mary McNamara, read the entirety of this declaration to me word-for-word and I verified its accuracy to her and told her that I would sign it under penalty of perjury of the laws of the United States once I was able to access a computer terminal and return the signature page to her office.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __th day of _____, 2026 at USP Canaan, Pennsylvania.


/s/_____
Shane Cratty
[signature to be provided]

9

**Cratty Decl. ISO Defendant's Motion for Compassionate Release**
*United States v. Shane Cratty*, CR 19-681 CRB